**HUNT BUILDING COMPANY, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Actus Lend Lease, LLC, Intervenor.**

**No. 04–505C.**

United States Court of Federal Claims.

Filed Under Seal July 8, 2004.

Redacted Version Filed July 21, 2004.[1]

---

1. This opinion was issued under seal on July 8, 2004. The Court invited the parties to submit proposed redactions by July 14, 2004. The Court accepts the parties' proposed redactions in part and publishes this opinion as redacted, correcting errata. Redactions are indicated by brackets "[ ]."

James J. McCullough with Deneen J. Melander, Steven A. Alerding, and Abram J. Pafford, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, D.C. for Plaintiff.

Carolyn J. Craig, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant, Michael J. O'Farrell, Jr., Department of the Air Force, Arlington, Virginia, Of Counsel; J. Michael Littlejohn, Wickwire Gavin, P.C., for Intervenor; Hal J. Perloff, Daniel J. Donohue, Claude P. Goddard, Jr., Wickwire Gavin, P.C., Of Counsel.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND ENTERING A PERMANENT INJUNCTION

WILLIAMS, Judge.

Hunt Building Company, Ltd. (Hunt) filed this pre-award bid protest challenging the Air Force's selection of Actus Lend Lease, LLC (Actus) as the successful offeror (SO) proposed for an award of a military housing privatization project at Hickam Air Force Base, Hawaii. The Solicitation provided for a three-stage process, first, the competitive selection of an SO, followed by the Air Force and the SO's finalization of form legal documents necessary for the transaction, and then, the closing. This protest was filed after selection and before closing. The Air Force agreed to delay closing pending the resolution of this protest.[2] This matter is before the Court on Defendant's and Intervenor's motions to dismiss and the parties' cross-motions for judgment on the Administrative Record.[3]

Defendant and Intervenor sought dismissal on grounds of ripeness, standing, timeliness, waiver and failure to state a claim upon which relief can be granted. These motions highlight both the unusual nature of the transaction at issue and the atypical procedural posture of this protest. Although closing has not occurred, the Court finds the matter ripe for review since the Air Force has represented that the transaction documents that will form the basis of the award have been finalized. Hunt has standing since it received the exact same technical and risk ratings as Actus, submitted an "outstanding" proposal, was the only other offeror, and had a substantial chance to receive award. The protest is timely because Hunt is not challenging the terms of the Solicitation, but rather the Air Force's failure to comply with the Solicitation. Finally, Hunt has not waived its right to protest and has stated claims that the Air Force failed to comply with the Solicitation and treated offerors unfairly and unequally, which can be remedied by the Court.

Hunt claims that the Air Force relaxed material Solicitation requirements by changing the terms of the form legal documents which were to be executed at closing for Actus but not Hunt, resulting in Hunt and Actus submitting final proposal revisions (FPRs) based on different requirements. Hunt has established three prejudicial violations of the Solicitation. First, the Air Force changed a condition of the Lease which limited a mortgagee's ability to postpone termination of the Lease to a six-month period, a limitation both offerors deemed onerous. Both Hunt and Actus complained during discussions with the Air Force that this six-month limitation could result in termination of the Lease even when the mortgagee was proceeding diligently to cure the Lessee's

---

**2.** The Air Force and Actus anticipate closing on July 9, 2004, so the Court expedited consideration of this matter. Plaintiff filed its Complaint on March 30, 2004, along with a motion for a temporary restraining order and a motion for a preliminary injunction. Defendant's agreement to delay closing rendered these motions moot. The parties further delayed filing of the Administrative Record and briefing pending finalization of the form legal documents.

**3.** On May 7, 2004, Intervenor filed a motion to dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(6). Plaintiff filed its opposition to Intervenor's motion to dismiss on May 28, and Intervenor replied to Plaintiff's motion on June 8. Plaintiff filed a Motion for Judgment on the Administrative Record on June 1, 2004, Defendant and Intervenor filed responses and cross-motions for judgment on the Administrative Record on June 14, 2004, Plaintiff filed its opposition on June 17, 2004, and the Court heard oral argument on July 1, 2004.

default and thus imposed an unacceptable risk on the lender of forfeiting the primary collateral securing the loans, i.e., the Lease.

Hunt had asked for this revision twice, but the Air Force rejected Hunt's request. Hunt stopped asking for this change after the Air Force warned offerors that their proposals could be downgraded or rejected if they continued to press for modifications to the form legal documents which had been rejected. Actus took a different tack and filed an agency protest, claiming the six-month limitation imposed an "inordinate risk" and was a "deal breaker." In order to settle Actus' agency protest, the Air Force, unbeknownst to Hunt, relaxed the six-month limitation. The term was changed for Actus to state that termination could be postponed up to six months or such longer period as the mortgagee may request and the Government may approve, and that such Government approval could not be unreasonably withheld. This change to the form Lease was not similarly made for Hunt, and the Solicitation was not amended to reflect it. Hunt was prejudiced by its inability to change its financial proposal and take advantage of the decreased risk to its lender and concomitant decreased costs of financing afforded by this change.

Second, the Solicitation provided that the terms of the form legal documents the Air Force executed with the SO after selection would be "substantially identical" to the form legal documents appended to the Solicitation, with revisions permitted to finalize administrative details, but not to change the basis on which selection had been made. The Air Force violated the Solicitation by permitting Actus to make changes, post-selection, to a number of terms of the form legal documents, addressing termination of the Lease for failure to agree on final plans, pest control, excusable delay, the contingency of base closure, default, and applicability of Hawaii law—in all cases relaxing or clarifying the terms of the documents such that they were not "substantially identical" to those in the Solicitation, to Actus' benefit.

Third, the Solicitation contemplated that selection of the SO and award and closing would be based upon the SO's final revised proposal as it was evaluated. However, the Air Force invited Actus to revise its proposal three times after selection, and Actus did so, whereas Hunt never was afforded an opportunity to revise its final proposal submitted prior to selection.

Because the Air Force failed to comply with its Solicitation, changed material terms without advising Hunt, and failed to treat offerors fairly and equally, all to Hunt's prejudice, the Court grants Plaintiff's protest. In balancing the factors for injunctive relief, the Court concludes that this extraordinary remedy is warranted here, given the pervasive failures to comply with the Solicitation, the prejudice to Hunt by the imposition of higher risk, and the public interest in ensuring the integrity of the Government contracting process.

### Factual Background [4]

### The Military Housing Privatization Initiative

The solicitation was issued pursuant to the Military Housing Privatization Initiative (MHPI) of the National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106 (codified at 10 U.S.C. §§ 2870–2885), as amended. This Act authorizes the Secretary of Defense and the Secretaries of the military departments to acquire or construct family housing units and military unaccompanied units on or near military installations within the United States, its territories and possessions in accordance with the provisions in the MHPI. 10 U.S.C. § 2872. Section 2872a authorizes the Secretaries to furnish utilities and services, including electric power, steam, compressed air, water, sewage and garbage disposal, natural gas, pest control, snow and ice removal, mechanical refrigeration, telecommunications service, and fire and police protection services.

4. The factual background is derived from the Administrative Record, as supplemented by three declarations of Plaintiff's principal, James C. Hunt, a declaration and a deposition of Plaintiff's expert economist specializing in affordable housing development, Roberto J. Cavazos, and two declarations of the lender for both Plaintiff and Intervenor, Daniel Ray of GMAC.

### The Solicitation

The Project involves the privatization of approximately half of the military family housing at Hickam Air Force Base. The goal of the Project is to provide military families living on base, "access to safe, quality, affordable, well-maintained housing in a community where they will choose to live." Administrative Record (AR) 4. Since traditional Military Construction (MILCON) funds were unavailable to meet this goal in a timely manner, the Air Force decided to use privatization to leverage available resources to "accelerate housing improvements, alleviate housing shortages, and reduce waiting times for new housing, ultimately improving morale of Air Force personnel." *Id.*

On April 12, 2002, the Air Force issued solicitation number KNMD2002–00–01 for the Hickam Project, "soliciting proposals from qualified entities interested in entering into a business arrangement with the Air Force" as a competitive, unrestricted Request for Proposals (Solicitation). The following provisions are pertinent:

### 1.4 PROJECT SUMMARY

**1.4.1 PROJECT CONCEPT.** The project involves a non-Federal Acquisition Regulation (FAR), real estate transaction with the Successful Offeror (SO) under which the Government will convey 1,356 existing housing units and certain associated improvements, and lease approximately 238 acres of land divided among 2 parcels including the Capehart Parcel hereafter referred to as "Capehart," and Earhart Parcel hereafter referred to as "Earhart." These parcels are defined in the Lease of Property (Appendix U). The Government may provide or facilitate the provision of permanent financing in accordance with Section 3.0. In exchange, the SO shall obtain necessary construction financing; provide required equity; obtain necessary permanent financing; and plan, design, develop, renovate, demolish, construct, own, operate, maintain, and manage a rental housing development, including all paving and drainage, as well as any utilities conveyed to or constructed by the developer, for a minimum of 1,356 military families for 50 years .... All privatized units shall

be designated for occupancy as Junior or Senior Non Commissioned Officer (JNCO and SNCO) housing, and rent shall not exceed the Basic Allowance for Housing (BAH) at the dependant rate for the designated military pay grade, minus an amount sufficient to cover 110% of average estimated electric charges. The rent includes water and sewer utility costs. The developer will also renovate 36 Original houses, which are not conveyed to the developer. Offeror may propose, for Government evaluation, alternatives to the Government prescribed work above so long as the project goal and all other requirements of the solicitation are met. The Government may accept such proposal from Offeror in whole, in part, or not at all, at its discretion.

**1.4.1.1 HOUSING CONVEYED.** At the close of the transaction, the Air Force will convey its interest in 1,356 family housing units constructed in various phases since 1959 ....

**1.4.1.2 CONSTRUCTION OF PRIVATIZED UNITS AND OTHER IMPROVEMENTS.** The project requires the construction of 16 new three-bedroom units, renovation or replacement of 1,022 units, and the demolition of 16 existing units to be accomplished within eight years of the closing. The work must be phased throughout the construction period to permit maximum availability of on-base housing, minimize resident moves, and avoid inconvenience to the greatest extent possible. A minimum of 1,000 units must be available for occupancy at all times during the construction period. Referral by the base of new residents to the privatized housing may not occur if the resident would be required to vacate that unit prior to a one year occupancy due to scheduled construction.

AR 4–5.

### 1.6 SELECTION STRATEGY

This will be a real estate transaction, not a FAR transaction (held to the rules of the Federal Acquisition Regulations). The intent is to use *fair,* timely and cost-effective *procedures for the evaluation and selec-*

*tion of the offer most advantageous to the Air Force.* The final selected proposal shall offer the best value in terms of the SO's business arrangements and financial plan for the 50–year term, design, construction, renovation, and real estate management, as well as an assessment of credit worthiness and past performance. The Government reserves the right for a follow-on sole source procurement with the SO's principal parties in case of a future privatization effort on Hickman AFB.

AR 6 (emphasis added).

## 3.0 PROJECT REQUIREMENTS AND DESIRED FEATURES SECTION

Section 3 identifies the Air Force's minimum project requirements (the lowest standard the Government will accept) and the desired features (attributes deemed to be of additional benefit). Offerors are encouraged to be innovative and submit other enhancements not specifically identified in this solicitation. The Air Force reserves the right to award additional evaluation credit to such enhancements based upon its assessment of their added value . . . .

. . . .

## 3.2 BUSINESS ARRANGEMENTS, FINANCIAL PLAN AND STRUCTURE

**3.2.1 Instruments.** *The Government anticipates that revisions may be made to the instruments for the purpose of ensuring that the documents are consistent with the Selected Proposal and the Government's requirements for the development.* At or before the time of the closing, the Government and the SO will execute all applicable instruments, and the SO shall enter into possession of the property and commence performance of its obligations under the Selected Proposal. The Government anticipates that the documents to be executed may include, but are not limited to, the following:

- Lease of Property, with a companion Operating Agreement (Appendix U)
- Quitclaim Deed (Appendix V)
- Forward Commitment (Appendix M), if required

- Intercreditor Agreement (Appendix P), if required
- Note for Government Direct Loan, including rider (Appendix N), if required
- Mortgage for Government Direct Loan, including rider (Appendix N), if required
- Lockbox Agreement (Appendix Q)
- SO Counsel Opinion Letter (Appendix Y)

**3.2.2 REAL ESTATE AGREEMENTS.** At the closing of the transaction, the Government will lease all parcels to the SO under a Lease of Property with a companion Operating Agreement and convey all housing units and associated improvements by a quitclaim deed. The SO shall be required to execute each of the applicable instruments identified in 3.2.1, *with provisions substantially identical to the Appendices referred in 3.2.1* . . . .

**3.2.2.1 LEASE OF PROPERTY AND OPERATING AGREEMENT.** The Lease of Property is at Appendix U with a companion Operating Agreement at Exhibit E. The Lease of Property for Parcels A and B will expire in 50 years. The purpose of the Operating Agreement is to implement the terms and conditions of the Lease of Property for the design, construction, renovation, demolition, operation, management and maintenance of the housing development on Government land . . . .

**3.2.2.2 QUITCLAIM DEED FOR CONVEYANCE OF IMPROVEMENTS.** The Quitclaim deed conveying improvements, attached at Appendix V, will be subject to all existing restrictions, if any, and any access rights that may be necessary with respect to utility distribution systems.

**3.2.3 FINANCING.** It is the responsibility of the Offeror to arrange the necessary debt financing and equity. The Government participation in the financial agreements may include a Direct Loan. Offerors shall utilize their equity contribution and private sector commercial loan proceeds before using the Government Direct Loan in project financing. The Air Force has the authority to obligate Government funds to support this project. The Air Force must pay a subsidy cost to secure

the Government contribution for this project. The subsidy is calculated by the Office of Management and Budget and referred to as the "Scored Amount." The Competitive Sourcing and Privatization Division (OSD/CS & P) has developed a scoring model, which will allow the Offeror to estimate the scored amount of its proposal. The model is at: http://www.afcee.brooks.af.mil/ebsh/asp/advertised solicitations.asp. The maximum scored amount cannot exceed $2.6M using this scoring model for this project. The Offerors shall carefully consider the best possible means of minimizing long-term risk and cost to the Air Force by leveraging funding for the project through a financial strategy that maximizes the use of private funding to support the development. It is the responsibility of the Offeror to assure that there are sufficient sources of equity, debt, and net operating income from occupied units to permit completion of the Design, Construction and Demolition Requirements (Section 3.3) within the Offeror's planned time frame. To the extent that completion of the Requirements is dependent upon net operating income from the operation of occupied units, the Offeror's proposal must address means for assuring completion and adequate funding sources in the event that net operating income is lower than projected.

. . . .

### 3.2.3.1 GOVERNMENT DIRECT LOAN.

The Government is willing to provide a direct permanent loan to the SO if required to support this Project. The Government's subsidy cost ("scored cost") for providing the direct loan is estimated as the sum of the interest rate subsidy and the default subsidy . . . .

. . . .

### 3.2.3.5 ADDITIONAL FINANCING.

Any additional financing related to this project is subject to Government approval and will be subordinate to both the private sector first mortgage and Government Direct Loan.

. . . .

### 3.2.3.8 INTERCREDITOR AGREEMENT.

As a condition to providing a Government Direct Loan, the Government will require the execution of an Intercreditor Agreement (Appendix P) between the Private Lender and the Government. (See also 3.2.3.1.11).

### 3.2.3.9 OFFEROR'S EQUITY AND NET CASH CONTRIBUTION

**3.2.3.9.1** The Government requires the SO to make an equity contribution in the amount of no less than 6% of total project costs. This Offeror equity shall be a direct cash contribution at the time of project closing. Other sources of equity, which the SO will not include in the 6%, may include direct infusions by the Offeror at later dates, interest on unutilized private sector loan proceeds, earned but unfunded developer fees, and other sources that the Offeror may propose.

. . . .

### 3.2.6 EXPIRATION OF LEASE OF PROPERTY.

Upon expiration of the Lease of Property, or any extended term thereof, there are three options available at the sole digression [sic] of the Government. For proposal purposes, the demolition option [3.2.6.1] shall be used.

**3.2.6.1** The SO shall demolish the housing units and other facilities, improvements, and underlying utilities or remove them from the leased land; restore the land; and then surrender the land to the Government.

. . . .

### SECTION 4.0 SUBMISSION OF OFFERS

. . . .

### 4.1.1 SUBMITTAL DUE DATES.

A competitive range determination will be accomplished on the Initial Proposal. An expanded proposal will be requested and new submittal date will be established and communicated to those Offerors remaining in the competitive range.

. . . .

## 4.5 PROVISIONS.

Offerors are required to comply with the following provisions while developing their proposal .... *Any information concerning the solicitation given to any prospective Offeror will be furnished promptly to all other prospective Offerors. If the information is necessary in submitting offers or if the lack of it would be prejudicial to any other prospective Offerors, the information will be furnished as an amendment to the solicitation.*

. . . .

**4.5.2 HOLD HARMLESS.** By participating in the solicitation process, Offerors agree to hold the United States, its officers, employees, representatives and consultants harmless from and to waive all claims, liabilities and costs related to all aspects of this solicitation and/or this privatization project. Under no circumstances shall the Government be liable for any proposal preparation fees, real estate brokerage commissions, finder's fees, loan fees, equity placement fees, or other forms of fees, expenses, or compensation related in any way to activities undertaken by any person as a result of this solicitation.

**4.5.3 AMENDMENTS TO SOLICITATION.** *This solicitation may be amended by formal amendment document, letter, or facsimile.* If this solicitation is amended, then all terms and conditions that are not expressly modified remain unchanged. Offerors shall acknowledge receipt of any amendments to this solicitation by the date and time specified in the amendment(s). Acknowledgment shall be made by signing and returning the amendment(s), or sending a signed letter or facsimile of acknowledgment.

. . . .

## 4.7 MODIFICATIONS

Any modification of a proposal, except a modification resulting from the Government representative's request for "final" offers, is subject to the same conditions as listed in Paragraph 4.1. A modification resulting from the Government's request for "final" offers received after the time and date specified in the request may not be considered unless received before selection and the late receipt is due solely to mishandling by the Government after receipt at the Government installation.

. . . .

## 4.9 RESOLUTION OF ADMINISTRATIVE DETAILS

The Government anticipates there will be a need to resolve additional administrative details after selection of the SO. This may include finalizing the remaining administrative financial contingencies and completing all agreements in order to close with the SO. *This post-selection process to resolve details will not encompass issues that affect the basis on which the source selection decision was founded.* If, for whatever reason, the Government and SO are unable to complete this process within 60 days of notification of selection, the Government reserves the right to establish a new closing date or to select a new SO. In the event a new SO is selected, neither the old SO nor the Government will be entitled to reimbursement of cost or other indemnification from the other party.

. . . .

## SECTION 5.0 SELECTION PROCESS

### 5.1 SELECTION STRATEGY

5.1.1 The strategy for the Hickam AFB housing privatization initiative is to utilize a non-FAR (not governed by Federal Acquisition Regulation), "Best Value" solicitation strategy that encourages maximum flexibility in proposal development within the parameters set forth in this solicitation.

5.1.2 The goal of the source selection strategy is to select the proposal that best realizes the Installation housing goal and demonstrates the Offeror's commitment to a long-term relationship with the Installation. "Best Value" is defined as the proposal offering military families access to affordable housing with outstanding facilities and real estate services, which is affordable to the Government, and offers the overall Best Value for the 50 year term.

**5.1.3** The Government will determine the "Best Value" based on an integrated assessment of technical and financial strategy and business plan factors, proposal risk, performance risk and cost to the Government for subsidized financing. The Government reserves the right to select a proposal which is more costly to the Government over a less costly proposal, if the more costly proposal is otherwise more advantageous.

## 5.1.4 SOURCE SELECTION PROCESS.

**5.1.4.1** Offerors shall submit their past performance (Volume II) and credit reference information no later than the time and date identified in Paragraph 4.1.1 . . . .

**5.1.4.2** Offerors shall then submit a complete Initial Proposal no later than the time and date identified in Paragraph 4.1.1. The Initial Proposal shall include an Executive Summary, including all business arrangements and financial strategy, 15 percent concept design and construction, and real estate management plans. It will include all required information to be incorporated into Volumes I, II, III, IV, and V except where specifically reserved for later submittal. Oral Presentations will be held after receipt of the Initial Proposal. Offerors are advised that the competitive range may be made without discussion. Therefore, proposals shall be submitted initially on the most favorable terms regarding financial, technical, and other factors. Do not assume that Offerors will be contacted or afforded an opportunity to clarify, discuss, or revise proposals.

**5.1.4.3** Following evaluation of the Initial Proposals, the Government will establish a competitive range (up to 5 Offerors) of those Offerors that have the highest potential of being selected for award. *The Government will hold discussions with those Offerors in the competitive range and will require those Offerors to submit a more comprehensive proposal (based on a 35 percent design).* After receipt of the comprehensive proposal, the Government may select the Offeror's proposal representing the "Best Value" without further discussion or issue evaluation notices (ENs) and

hold discussions with some or all remaining Offerors.

**5.1.4.4** *Next, the Government will request final proposal revisions and then reassess the proposals, select the Offeror whose proposal provides the best value to the Government, and finalize the financing and administrative details for implementing all agreements to close the deal. If the Government is unable to finalize the financing, administrative details and changes to legal documents with this offeror within a reasonable period of time, it reserves the right to terminate its discussions and begin discussions with the next offeror providing the best value to the Government.*

. . . .

## 5.5 FINANCIAL AND TECHNICAL PROPOSAL SUBMITTALS

. . . .

**5.5.4 ASSESSMENT CRITERIA.** The following criteria will be used to evaluate business and technical information as part of the rating and proposal risk assessment process.

**5.5.4.1 BASIC ASSESSMENT CRITERIA.** All business and technical information will be assessed using the following basic criteria. Both are of equal importance.

- **UNDERSTANDING THE REQUIREMENT.** The Offeror's proposal will be assessed in terms of the degree to which the Offeror understands and complies with the requirements of the solicitation . . . .

- **SOUNDNESS OF APPROACH.** The Offeror's proposal will be assessed in terms of the degree to which the proposal, relating to particular items, is logical, defensible and consistent with all other parts of the proposal . . . .

**5.5.4.2 FINANCIAL ASSESSMENT CRITERIA.** In addition to the basic assessment criteria defined above, financial information will be assessed using the following criteria. Each is of equal importance.

- **COMPLETENESS.** All information and data required to support the proposal has been provided and assumptions

and estimates on which the proposal is based are clearly defined.

- **REASONABLENESS.** Information and data is fully justified and supported and is considered fair and under current market conditions.
- **REALISM.** Information and data is compatible with proposed scope of effort and operations reflect reasonable economy and efficiency.

**5.5.5 Ratings.** The solicitation identifies both basic requirements (the absolute lowest standard the Government will accept) and desired features (additional attributes deemed by the Government to be beneficial to the military families). Basic requirements will be assessed with a green/yellow/red color ratings. Proposals that exceed basic requirements by incorporating desired features or other innovations which are deemed to have value to the Air Force may receive additional evaluation credit, which may result in a blue rating. A red rating for any factor is carried forward as an overall red rating for the respective volume. The following chart summarizes the code system to be used to assign color ratings for each of the factors.

| Color | Rating | Definition |
|-------|--------|------------|
| Blue | Exceptional | Exceeds specified minimum performance or capability requirements in a way beneficial to the Air Force. |
| Green | Acceptable | Meets specified minimum performance or capability requirements necessary for acceptable performance. |
| Yellow | Marginal | Does not clearly meet some specified minimum performance or capability requirements necessary for acceptable performance, but any proposal inadequacies are correctable. |
| Red | Unacceptable | Fails to meet specified minimum performance or capability requirements. Proposals with an unacceptable rating are not awardable. |

**5.5.6 PROPOSAL EVALUATION.** Separate ratings and proposal risk will be assigned to each evaluation factor pertaining to Volumes III, IV and V. The separate evaluation factor ratings will be rolled up into a volume level rating. One overall performance risk assessment will be made for the proposal as a whole. Volume I will not be rated, but the information will be used in the evaluation of Volumes III, IV and V. The evaluation will be based on an integrated assessment of all proposal volumes. When considering ratings and proposal risk, the volumes will be weighted in importance. *Business Arrangements, Financial Plan and Structure (Volume III) is more important than either Design and Construction (Volume IV) or Real Estate Management (Volume V).* Design and Construction (Volume IV) and Real Estate Management (Volume V) are equal in weight. Overall, "Performance Risk", "Ratings" and "Proposal Risk" are of equal importance. The proposal determined to be the Best Value will be the one determined to have the potential to best meet the Hickam AFB housing privatization goal.

**5.5.7 FINANCIAL AND TECHNICAL PROPOSAL RISK.** Proposal risk assesses the risk associated with the Offeror's proposed approach as it relates to accomplishing the requirements of the solicitation including the SO's long-term financial commitment to the project. All business/financial and technical proposal information will be assessed for proposal risk at the factor level and summarized at the volume level, as follows:

| PROPOSAL RISK | |
|---------------|---|
| High (H) | Likely to cause significant disruption of schedule, increased cost or degradation of performance. Risk may be unacceptable even with special emphasis and close Government monitoring. |
| Moderate (M) | Can potentially cause some disruption of schedule, increased cost, or degradation of performance. Special emphasis and close Government monitoring will probably be able to overcome difficulties. |
| Low (L) | Has little potential to cause disruption of schedule, increased cost or degradation of performance. Normal effort and normal Government monitoring will probably be able to overcome difficulties. |

**5.5.8 PERFORMANCE RISK.** Performance risk relates to the assessment of an Offeror's present and past work and accomplishments to determine the Offer-

or's ability to successfully perform as required .... Performance risk is assessed as follows:

| PERFORMANCE RISK | |
| --- | --- |
| E (Exceptional/ High Confidence) | Based on the Offeror's performance record, essentially no doubt exists that the Offeror will successfully perform the required effort. |
| V (Very Good/ Significant Confidence) | Based on the Offeror's performance record, little doubt exists that the Offeror will successfully perform the required effort[.] |
| S (Satisfactory/ Confidence) | Based on the Offeror's performance record, some doubt exists that the Offeror will successfully perform the required effort. |
| M (Marginal/ Little Confidence) | Based on the Offeror's performance record, substantial doubt exists that the Offeror will successfully perform the required effort. Changes to the Offeror's existing processes may be necessary in order to achieve contract requirements. |
| U (Unsatisfactory/ No Confidence) | Based on the Offeror's performance record, extreme doubt exists that the Offeror will successfully perform the required effort. |

## 5.6 FINANCIAL AND TECHNICAL PROPOSAL EVALUATIONS.

### 5.6.1 FINANCIAL AND TECHNICAL RATINGS.
Using the assessment criteria in Paragraph 5.5.4, financial and technical information (Volumes III, IV and V) will be evaluated against the standards, and ratings will be assigned.

### 5.6.1.1 EVALUATION STANDARDS.
A standard establishes a baseline to measure how well an Offeror's business/financial or technical proposal satisfies evaluation criteria. A standard may be either qualitative or quantitative, depending on the criteria it addresses. Standards are established at the factor level. Evaluators will rate each proposal against established standards. The results of the evaluation against the standards will be documented at the lowest level evaluated. Results will then be summarized at the factor and volume level.

### 5.6.1.2 VOLUME III, BUSINESS ARRANGEMENTS, FINANCIAL PLAN AND STRUCTURE.
The factors listed below are of equal importance:

#### 5.6.1.2.1 FACTOR 1: FINANCIAL STRATEGY.
The standard is met when:

1) The information provided is complete, reasonable, and realistic.

2) The Offeror's proposal shows that the financial risk (e.g., default, interest rate, etc.) to the Project is reasonable. *The lower the risk the more favorable this factor will be evaluated.*

3) The scored amount does not exceed the $2.6M funds available for this project. The lower the score the more favorable this factor will be evaluated.

4) The information submitted by the Offeror and its lender(s) clearly demonstrates the ability of the Offeror to obtain and execute the necessary financing for the project. The Government will evaluate any conditions and/or contingencies in the lender's letters. Conditions and/or contingencies may have a direct impact on the Government's assessment of proposal risk. The less material conditions and/or contingencies the more favorable this factor will be evaluated.

5) The proposed loans meet the terms and conditions outlined in the Solicitation and the legal documents. Offerors proposing a term less than 40 years on the Direct Government Loan or no Direct Government Loan will be evaluated more favorably.

6) The Offeror provides its initial cash equity contribution of at least 6% of total project costs at closing; and the Offeror clearly defines the source of and return on its equity. The Offeror has projected a net cash contribution of at least 6% of total project costs at the time of permanent financing.

7) If a Direct Loan is proposed, the Borrower Application form is com-

plete and acceptable to the Government.

AR 6, 15–16, 18, 20, 52, 63–64, 66, 68–69, 71, 83–86 (emphasis added).

### The Form Legal Documents in the Appendices to the Solicitation

As listed in Section 3.2.1, the Government anticipated executing the form legal documents with the SO after selection. The legal documents were characterized as "governing the project" and as "Key Controlling Documents" in Section 1.5 of the Solicitation. AR 6. The relevant terms of these form legal documents are:

### The Property Lease

### Default and Termination

Under the provisions of Condition 7, the Government was entitled to terminate for "default" or for failure to agree on final plans. Default was defined as (1) a failure to comply with any provision of the Lease where such failure continued for thirty days after delivery of written notice thereof by the Government (unless the Government extended the period and the awardee acted in accordance with a Government-approved compliance schedule) or (2) the occurrence of certain bankruptcy-related events. AR 461–62.

Condition 7.1.1, which dealt with non-bankruptcy-related default, stated:

7.1 The following shall constitute a "Default" under this Lease:

7.1.1 The Lessee's failure to comply with any provision of this Lease, where such failure to comply continues for thirty (30) days after delivery of written notice thereof by the Government to the Lessee. If, however, the Government determines that the time required to return to compliance exceeds the thirty (30) day period, the Lessee shall not be deemed to be in Default if the Lessee, within such longer period as may be approved by the Government, begins and continues to prosecute the actions necessary to bring the Lessee into compliance with this Lease in accordance with a compliance schedule approved by the Government.

AR 461–62.

The default termination provision of the Lease stated:

7.3.2 The Government may terminate this Lease, upon written notice to the Lessee, and without any cost or liability to the Government, in the event of any Default under this Lease by the Lessee at any time after the expiration of the cure period provided in Condition 7.1.1, if applicable (such notice shall be referred to as a "Termination Notice for Default"). The Termination Notice for Default shall be effective as of the date to be specified therein, which shall be at least five (5) but not more than thirty (30) days after its receipt by the Lessee.

AR 463.

Also relevant to the Government's right to terminate the Lease for default was Condition 7.2:

7.2 No Default shall be deemed to have occurred pursuant to Condition 7.1.1 for any period of time during which the Parties are attempting to resolve a dispute, pursuant to the procedures provided for in Condition 24, in relation to the actions or inactions which are the subject of the alleged Default. If, pursuant to dispute resolution procedures, the Default is determined to have occurred, the Lessee's period for cure shall not begin until the day after the final decision on the dispute is issued.

AR 463.

Condition 24, "Disputes," referred to in Condition 7.2, stated that disputes valued at $10,000 or less (exclusive of interest) between the Lessee and the Government related to the Lease and not capable of resolution by negotiation shall be decided by the Commander, whose decision shall be final and not subject to challenge or appeal. AR 495. Conditions 24.2.1 and 24.2.2 stated that disputes valued at more than $10,000 (exclusive of interest) unable to be resolved by negotiation shall be decided by the Commander, but the Lessee shall have the right to appeal the decision of the Commander within thirty days to the Secretary of the Air Force, and that the Secretary of the Air Force's decision

shall be final unless appealed to a court of competent jurisdiction. AR 495–96. Condition 24.4 stated that the Government's obligation to make any payment pursuant to the Lease "is contingent upon the availability of appropriated funds proper for such payment." AR 496.

Condition 17, "Construction of Improvements and Alternations," provided in relevant part that:

> *17.1.2.5* If, within sixty (60) days after the Lessee's initial submittal to the Government of the proposed 100% Capehart Plans, the proposed 100% Earhart Plans and the proposed 100% Licensed Area Plans, whichever occurs last, the Government has not approved all such Plans, the Government shall have the right to terminate this Lease as provided in Condition 7 above (and/or pursue any other remedies available pursuant to Condition 7) without any cost or liability to the Government.

AR 479. In the event that the parties failed to agree on the "Final" housing development plans within the time specified in Condition 17, Condition 7.3.1 gave the Government the right to terminate the Lease without cost. Condition 7.4 provided that the Lessee waives any claims or suits against the Government arising out of a termination for failure to agree on final plans. AR 463.

Condition 23, "Liens and Mortgages," set out the rights of each mortgagee in the event that the Government elected to terminate the Lease in the event of a default by the Lessee:

> *23.7* If the Government shall elect to terminate this Lease by reason of any Default described herein with respect to this Lease, each mortgagee that shall have become entitled to notice as provided in this Condition 23 shall not only have any and all rights of the Lessee with respect to curing of any Default, but also shall have the right to postpone and extend the specified date for the termination of this Lease ("Mortgagee's Right to Postpone") in any Termination Notice, subject to the following conditions:
>
> . . . .
>
> *23.7.3* The Mortgagee's Right to Postpone shall extend the date for the termi-

nation of this Lease specified in the Termination Notice for a period of not more than six (6) months.

AR 494.

### Tenants and Leasing

Condition 20 of the Lease, "Tenants and Leasing," required that the Lessee agree that "Referred Tenants," certain military members and referrals from the Installation's Housing Management Office, were the intended tenants of the housing and that it would rent to "Other Eligible Tenants" only as provided for in Condition 20.7. That condition stated, in relevant part:

> *20.7 Leasing Limitations Concerning Other Eligible Tenants.* Tenant leases with Other Eligible Tenants shall not have a term in excess of one (1) year. The Lessee acknowledges and agrees that the Government is agreeing to permit the occupancy of Housing Units by Other Eligible Tenants (in the priority set forth in this lease) during the Lease Term solely as an accommodation to the Lessee and that Referred Tenants shall re-acquire priority placement rights (as provided in the Tenant Assignment Plan) to each Housing Unit occupied by any Other Eligible Tenants following the expiration of the initial one-year term of such Other Eligible Tenant's lease. Upon expiration of the initial one-year term of the Other Eligible Tenant's lease, such lease may be renewed for one or more periods not to exceed six (6) months each.

AR 489.

### Excusable Delays

Condition 17.1.3.3 required the Lessee to complete the construction of the Improvement and the Original Houses in accordance with the construction schedule set out in the Final Plans subject to excusable delays and defined the term "excusable delays" as follows:

> "Excusable delays" include unavoidable delays due to strikes, acts of God, inability to obtain labor or materials, governmental restrictions, enemy action, civil commotion, fire, or similar causes beyond the reasonable control of, and without the fault or

negligence of, the Lessee and/or any others engaged in the construction of the Improvements and the Original Houses. The Lessee agrees that in the event the Lessee does not perform in accordance with the Construction Management Plan and the construction schedule set forth in the related Final Plans, as extended by such excusable delays, the failure shall constitute a Default by the Lessee under this Lease.

AR 480.

### *Maintenance and Development*

Condition 11 of the Lease, "Maintenance of Development," required that the Lessee ensure that the Development be maintained "essentially free of pests", but did not define what was meant by "essentially free of pests." AR 472.

Condition 16 of the form lease stated that the selected proposal would be incorporated into the Lease and defined the selected proposal as Volumes III, IV and V of the proposal selected by the Government. AR at 477.

### *Other Form Legal Documents*

Paragraph 20 of the Forward Commitment (FC), "Miscellaneous," contained the following subsection:

> h. At the time the Government makes the Direct Loan, neither the Borrower nor the Senior Lender shall be in default under this Commitment, and no event shall have occurred which, subject to the passage of time or the giving of notice, or both, would result in such a default.

AR 262.

Provision 23 of the Intercreditor Agreement stated:

> **Governing Law.** This Intercreditor Agreement shall be construed, and the rights and obligations of the Government, the Borrower, and the Senior Lender under this Intercreditor Agreement shall be determined, in accordance with the laws of the United States.

AR 397.

### *Initial Offers*

Proposals were submitted in five volumes: Volume I—Executive Summary; Volume II—Past Performance (Performance Risk); Volume III—Business, Financial Plan and Structure; Volume IV—Design, Construction and Renovation; and Volume V—Real Estate Management. AR 1017.

On July 8, 2002, Hunt submitted its initial proposal for Volumes III, IV and V. In its initial proposal, Hunt included an Exhibit A, requesting a change in Condition 23 of the Lease to delete the six-month limitation imposed on the lender's ability to extend the termination of the lease due to a Lessee default. AR 2216. Hunt's initial proposal included July 3, 2002 commitment letters from Hunt's lender GMAC in which GMAC agreed to act as a servicer of Hunt's Senior Loan, i.e., construction loan and permanent financing through GMAC Commercial Capital Markets and the second lien construction loan through GMAC Commercial Mortgage Corporation (GMACCM). AR 2189, 2197–98. GMAC's commitment was conditioned upon, among other things, the Air Force's agreement to make the changes Hunt requested in Exhibit A of its proposal concerning the Forward Commitment. AR 2200. In Volume III Hunt proposed a Government Direct Loan of [ ]and a Senior Loan of [ ]to be provided by GMAC Commercial Holding Corporation (GMACCHC). *Id.* at 2150–51. In its July 3, 2002 commitment letter, GMACCHC indicated that the Senior Loan would be secured by Project revenues, first mortgage and first lien security interest on the Project and funds and accounts held under a LockBox Agreement on which a lien in favor of the Senior Lender would be permitted. AR 2190. GMACCHC indicated that GMACCHC would act as the construction period guarantor to Hunt and guarantee payment of debt service on the Senior Loan during the Project construction period. *Id.* In its July 3 commitment letter for the second tier construction loan, GMACCHC indicated that Hunt would be responsible for paying a Senior Loan guarantee fee of [ ] basis points per annum until the Government Direct Loan was funded, i.e., when construction was completed. AR at 2201.

On July 8, 2002, Actus also submitted its initial Volume III—Business Arrangements,

Financial Plan and Structure. AR 6461–6839. Actus did not request any changes in the form legal documents. *Id.* Actus included a loan commitment letter from its proposed lender—GMACCHC—dated July 5, 2002. AR 6542–47. GMACCHC offered a [ ] Senior Loan and a[ ] construction loan. As security for both the senior loan (during the construction period) and the construction loan, GMACCHC indicated that Actus would be required to [ ]. AR 6543, 6545.[ ] AR 6234, 6436, 6473.[ ].

### The Competitive Range Selection

The source selection evaluation team (SSET), which included Avila Government Services and Ernst & Young, convened for two weeks to evaluate the proposals which had been submitted and completed their evaluation on July 19, 2002. AR 1015. Volume I, Executive Summary, was not evaluated, "but was used by each team to supplement information provided in their particular volume." AR 1017. The competitive range Evaluation Summary dated July 26, 2002, rated Plaintiff's and Intervenor's proposals as follows:

| Evaluation Summary—[Competitive Range] | | |
|---|---|---|
| Ratings and Proposal Risk | *Hunt* | *Actus* |
| Volume III | [ ] | [ ] |
| Financial Strategy | [ ] | [ ] |
| Project Financial Statements | [ ] | [ ] |
| Financial Strength | [ ] | [ ] |
| Volume IV | [ ] | [ ] |
| Community Development Plan | [ ] | [ ] |
| Facility Design and Construction | [ ] | [ ] |
| Project Management | [ ] | [ ] |
| Volume V | [ ] | [ ] |
| Real Estate Management | [ ] | [ ] |
| Experience | [ ] | [ ] |
| Performance Risk | [ ] | [ ] |

AR 1068.[5] Thus, as of the time of the competitive range determination, Hunt's Volume III rating in one of the subfactors was [ ] than that of Actus.

The SSET recommended that both Plaintiff and Intervenor be included in the competitive range, requested a Comprehensive Proposal from both Offerors and instructed the Air Force to "[p]rovide Evaluation Notices (ENs) to both Offerors allowing revision of proposals to meet solicitation requirements." AR 1069.

### Amendment 2 to the Solicitation

On August 8, 2002, the Air Force issued Amendment 2 to the Solicitation, which added, *inter alia,* the following provision:

3. **Paragraph 5.5.1.1(9) Review of Instruments**

 Add the following Paragraph 5.5.1.1(9) immediately following Paragraph 5.5.1.1(8)

 5.5.1.1(9) Review of instruments (shall be required after a competitive range determination). Offeror shall identify in writing any proposed exceptions or modifications to the terms of the instruments identified [in] paragraph 3.2.1.

AR 553.[6] This amendment amended the Solicitation section governing financial and technical proposal submittals, describing the contents of Offeror submittals. AR 71.

### Plaintiff's Proposed Changes to the Form Legal Documents

Plaintiff included "Exhibit A Comments to Proposed Hickam Documents" (Exhibit A Comments) with its 35 percent design proposal submission on September 9, 2002, which included a number of proposed changes to the form legal documents, including changes to the Lease, the Forward Commitment, and the Intercreditor Agreement. AR 3359. Specifically, Hunt requested that Section 20(h) of Forward Commitment governing default be removed as it was redundant. AR 3361. Hunt also proposed the following modifications, *inter alia,* to the Lease:

2. *Condition 7.1.1* [Default] As drafted, this provision provides too much control to the Government to determine if a Default has occurred .... Accordingly, please revise the second sentence of this section to read: "If, however, the time required to return to compliance exceeds the thirty (30) day period, the Lessee shall not be deemed

---

5. [ ]. AR 1020.

6. The Solicitation was amended three times.

to be in Default if the Lessee within such period shall begin the actions necessary to bring the Lessee into compliance with this Lease in accordance with a compliance schedule approved by the Government (which approval shall not be unreasonably withheld)".

. . . .

4. ***Condition 7.3.1*** [Default for failure to agree on Final Plans] The Ground Lease must provide a mechanism for resolving disagreements on the final plans between the Government and the Borrower without giving the Government the right to cancel the Ground Lease.[7] ... Please note that the applicant will withdraw this comment, if the comment in 28 below is agreed to (as it was in Wright Patterson).

. . . .

9. ***Condition 11.1.2*** [Pest Control] Please modify the standard required to be met by this section regarding pest control. It is unclear what "essentially free" means as a standard of performance. We suggest that a more objective standard is appropriate, such as revising the condition to require that the Lessee take such commercially reasonable steps as are consistent with those taken by owners and operators of other comparable multi-family projects in the vicinity of the Project to control the identified pests.

. . . .

13. ***Condition 17.1.[3].3*** [Excusable Delays] Please add the phrase "or any other causes" after the phrase "or similar causes" in the definition of "excusable delay." ... In addition, acts of terrorism and delays resulting from the Commander's actions under Condition 28 of the Ground Lease or Section 6(d) of the Operating Agreement should be included as excusable delays.

. . . .

23. ***Condition 20*** [Eligible Tenants] The requirements of this Condition should not apply after the date, if any, that the base is closed. At that point, the Lessee will need to have maximum flexibility to lease the project and the Air Force will no longer have an interest in preserving availability of units for government personnel. Further, because the Government is not providing a Government guaranty of the Senior Loan triggered upon the announcement of a base closure, the risk that the Project would need to function as a commercial enterprise at a revenue level high enough to continue to service the Senior and Construction/Direct Loans is heightened as is the need of the Borrower to have maximum flexibility to restructure or refinance the debt. As a result, the Borrower requests, that in the event of the announcement of a base closure, the Borrower would have the option (subject to the senior Lender's and Construction Lender's consent) to purchase the Government's fee interest in the Leased Premises for fair market value .... Unless and until this option was exercised, the Ground [L]ease would continue in effect in accordance with its terms except for any provision limiting the use, leasing, development or operation of the Leased Premises.

. . . .

26. ***Condition 23.7.3*** [Deletion of Six-Month Limitation on Postponing Termination] Please delete the six-month limitation imposed on the Lender's ability to extend termination of the Ground Lease by reason of a Lessee default. The Ground Lease is the primary piece of collateral securing the Senior Loan. So long as the Senior Lender is taking all commercially reasonable steps to cure a Lessee default and is prosecuting those steps with due diligence (in other words,

**7.** This was reiterated for proposed changes to Conditions 17.1.3.3, and 17.1.5, with the comment "Alternatively, the Lender will withdraw this comment if the dispute resolution procedures are revised to provide the Borrower with notice and an opportunity to present evidence prior to the Commander or the Secretary making a decision." AR 3362–63.

doing all that is reasonably possible ... to cure the default), the Senior Lender should not be at risk of the Air Force terminating the Ground Lease simply because the curing process takes more than six months. The six month period bears no relation to the amount of time that may be necessary for the Senior Lender to take the legal actions with respect to the Borrower (e.g., obtaining the appointment of a receiver or foreclosing the Senior Loan mortgage) necessary for the Senior Lender to be in a position to effect cure. Particularly since no Government guaranty of the Senior Loan will be provided, the six-month limitation should have no further application from and after the announcement of a base closure. At that point, the Air Force's interest in the Lessee's continued compliance with the Ground Lease would be less than the Senior Lender's interest in preserving the primary collateral for the Senior Loan.[8]

. . . .

28. *Condition 24* [Dispute Resolution] The dispute resolution provisions should provide the Borrower with the opportunity to be heard and present evidence prior to the Commander or the Secretary making a decision . . . .

. . . .

31. *Recording* Please add an additional miscellaneous provision that allows for the recording of the lease or a memorandum thereof in the appropriate real property records in the State of Hawaii.

AR 3361–64.

Finally, Hunt proposed a change to the Intercreditor Agreement that "Hawaii law shall apply if there is no applicable precedent under United States law." AR 3365.

**The Air Force's September 11, 2002, Response to Hunt's September 9, 2002, Request for Modifications**

On September 11, 2002, the Air Force issued an Evaluation Notice (EN) which responded to Plaintiff's requested changes. The EN stated:

> The Offeror has proposed numerous material modifications to the form legal documents included as appendices to the Solicitation (the "Form Documents"). *Based upon the Air Force's preliminary review of the Offeror's proposed modifications, the Offeror is not prepared to satisfy the Solicitation's requirement that the Offeror execute legal documents with provisions substantially identical to those included in the Form Documents. Moreover, the proposed modifications, if required by the Offeror [Hunt] to close the transaction, shall adversely affect the proposal risk and financial and technical ratings relating to the Offeror's Proposal.*
>
> The Air Force has previously closed several [Military Housing Privatization Initiative] transactions with legal documents substantially similar to the Form Documents. The Air Force strives to ensure that the legal documents remain uniform from deal to deal. The Air Force will consider limited modifications to the Form Documents if needed to make the documents consistent with the Selected Proposal. However, any such proposed modifications will be rejected by the Air Force if the Air Force determines that the modifications adversely affect the Air Force's rights or obligations under the legal documents or impose additional risks or costs on the Air Force.
>
> In order for the Air Force to complete its evaluation of the Offeror's Proposal, the Offeror must provide the Air Force with a complete list of all proposed modifications to the Form Documents that will be *required* by the Offeror prior to closing the transaction (proposed modifications that may be desired by the Offeror, but that will not be required, should be excluded from the list). Again, any required modification included on the Offeror's list that fails to satisfy the criteria stated above

---

**8.** Hunt had included this same request, using the identical language, with its initial proposal of

July 8, 2002. AR 2216.

shall cause the Offeror's Proposal to be evaluated less favorably. Further, the Offeror should be advised that, based on our discussions with Air Staff, many of the modifications proposed by the Offeror to date are likely to be rejected by the Air Force.

AR 1144 (emphasis added).

*Hunt's September 16, 2002, Revised Request for Modifications and the Air Force's March 13, 2003, Response to Hunt's Revised Request*

In response to the September 11, 2002, EN, Plaintiff submitted revised Exhibit A Comments and deleted a number of changes originally proposed, but repeated its proposed changes to Conditions 4, 7, 10, 16, 17, 20, 23, 24, 26, and 27 of the Lease, as well as terms in the Forward Commitment and the Intercreditor Agreement. AR 1155–66.

On March 13, 2003, the Air Force responded to Plaintiff's September 16, 2002 comments, stating:

1. The Government has reviewed each of Hunt's comments relating to the legal documents included with the RFP (the "Transaction Documents"). In the Attachment, the Government identifies (a) those provisions that the Government will revise to address Hunt's comments; (b) those Hunt comments that were rejected by the Government; (c) those Hunt comments that will require further information from Hunt before the Government can reach a conclusion as to whether the related provision will be revised; and (d) other information requested by Hunt.

2. *If Hunt or any of the transaction participants requires modifications to the Transaction Documents that were rejected by the Government, such modifications shall cause Hunt's Proposal to be evaluated less favorably or rejected.* On or before March 2003, Hunt must (a) notify the Government in writing which if any, of the comments rejected by the Government will not be withdrawn from Hunt's Proposal; (b) provide the Government with any additional information requested

in the Attachment; and (c) provide the Government with a revised financing commitment from Hunt's lender(s) which deletes all comments rejected by the AF, except those which Hunt refuses to withdraw.

3. If Hunt is selected by the Government, the Government will agree to revise the Transaction Documents to address only those modifications that have been identified in Hunt's Proposal and approved by the Government. Unless otherwise expressly indicated in the Attachment, the Government's acceptance of any such modification does not imply that the Government has approved verbatim any specific language that may have been provided by Hunt. Instead, such approval means that the Government will work with Hunt to develop revised language for the subject provision that is acceptable to both parties.

AR 1167 (emphasis added).

In the Attachment to that response, the Air Force rejected Hunt's requested revisions to Conditions 7.1.1 (Default), 17.1.3.3 (Excusable Delays), 20 (Eligible Tenants Base Closure), 23.7.3 (Deletion of Six-month Limitation to Postpone Termination), 24 (Dispute Resolution), and 17.1.5 (Dispute Resolution Without Giving Government Right to Cancel Lease). AR 1171–75. The Air Force also rejected Hunt's request that Hawaii law apply where there was no applicable federal precedent. AR 1177.

In response, Plaintiff dropped a number of its requests for changes, including deletion of the six-month limitation on postponing a termination in Condition 23.7.3. Hunt included, *inter alia,* the following requests stating that they were "must have" changes: Forward Commitment, removing Section 20(h); Ground Lease, Condition 7.1.1, requesting that an objective standard for determining whether the Lessee is in default (as opposed to a standard solely within the control of the Government) be used, Condition 7.4, requesting removal of this section or making it subject to the dispute resolution provisions, Condition 17.1.3.3, changing the definition of "excusable delay," Condition 24, adding dis-

pute resolution provisions to provide the Borrower with the opportunity to be heard and present evidence prior to the Commander or the Secretary making a decision, adding a provision to record the lease or a memorandum thereof in the appropriate real property records in the State of Hawaii; and Intercreditor Agreement, 23, providing that Hawaii law shall apply if there is no applicable precedent under United States law. AR 1258–60.

### The Air Force's Final Position on Hunt's "Must Have" Modifications

On April 16, 2003, the Air Force provided Hunt with its "final position" on the "must have" changes to the form legal documents proposed by Hunt on March 25, 2003. AR 1410–20. It stated, in part:

> This is our final position on the "must have" changes to the Air Force documents. After your consideration of these changes we need to know whether, after considering the attached, there are any issues remaining with the legal documents that would prevent you from closing a deal with the Air Force if you are selected. When considering this question please assume that no further changes will be made in the legal documents prior to closing. Please do not qualify your answer with language hinging on the prospect of additional negotiations with the Air Force and anticipated additional changes. While we expect that additional negotiations may be necessary to conform the documents to the deal if you are selected and that certain changes may be agreed to be necessary, we will not commit at this time to make any further changes in the legal documents.

AR 1410.

The Air Force agreed to delete the reference to the Senior Lender in Section 20(h) of the Forward Commitment and rejected Plaintiff's request to add language which would allow Hawaii law to apply if there was no applicable precedent under United States law. AR 1414, 1418. Additionally, the Air Force agreed to Plaintiff's proposed revisions to Conditions 7.1.1, 7.4, 17.3.3, 24 of the Lease, and agreed to record the entire Lease, other than the exhibits the parties mutually agreed to exclude. AR 1414–16.

### Hunt's April 21, 2003, Response to the Air Force's April 16 Request for "Must Have" Modification Requirements

On April 21, 2003, Plaintiff responded to the Air Force's April 16, 2003, letter asking whether there were any remaining issues with the legal documents that would prevent Hunt from closing a deal with the Air Force should it be selected. AR 1460. Hunt responded that there were two such issues: (1) the refusal to allow the Senior Lender and Construction Lender to have liens in a number of Accounts listed in the Lockbox Agreement, Sections 4.01(c), 4.01(d), and 4.04; and (2) the Air Force's rejection of Hunt's request to change the order of the application of insurance proceeds to accord with the Senior Loan documents, Section 10 of the Intercreditor Agreement. AR 1460–61. On April 24, 2003, the Air Force responded to Hunt's April 21 letter, allowing the requested modifications. AR 1463–64.

### Pre–Selection Relaxation of Condition 23.7.3 of the Lease in Response to Actus' Agency Protest

On September 9, 2002, Actus submitted its proposed revisions to the form legal documents. AR 1081–1142. Actus, like Hunt, proposed that the six-month limitation in Condition 23.7.3 on the Mortgagee's Right to Postpone Termination of the Lease be extended, as well as suggesting changes to Conditions 7, 11, 17, 20 and Paragraph 11 of the Forward Commitment and Paragraphs 10 and 23 of the Intercreditor Agreement. AR 1081–1139. On September 11, 2002, the Air Force issued the identical EN to Actus it had issued to Hunt, stating that the proposed modifications it required shall adversely affect proposed risk and financial and technical ratings. Actus responded to the September 11 EN, stating that [ ]. AR 1149–51.

On March 13, 2003, the Air Force responded to Actus' proposed exceptions and modifications, instructing it to identify which, if any, of the comments rejected by the Air Force would not be withdrawn by March 28, 2003. Rather than responding to the March 13, 2003, notice, Actus filed an agency-level protest. AR 1271–87. In that protest dated March 27, 2003, challenging the Air Force's

allegedly unduly restrictive provisions in the Solicitation as well as its failure to comply with the Solicitation's stated source selection process, Intervenor stated:

> The Air Force's failure to allow key changes to substantive terms of the draft form transaction documents imposes unduly restrictive requirements in violation of applicable procurement laws and regulations. Pursuant to the [Competition In Contracting Act], the Air Force is required to incorporate specifications in its solicitations that permit full and open competition. 10 U.S.C. § 2305(a)(1)(A)(i).
>
> . . . .
>
> While Actus is mindful that each service takes a different approach ... to MHPI projects and the Air Force is not required to adopt other agencies' approaches, it nevertheless is required to award this Project in a manner designed to achieve full and open competition. 10 U.S.C. § 2305(a). In this regard, the restrictive provisions in the RFP's draft form transaction documents fail to pass statutory muster. Publicly traded corporations and their subsidiaries like Actus, as well as prudent privately held entities, are unable or unwilling to compete in this environment.

AR 1281–82.

With regard to Condition 23.7.3 of the Lease, Actus' agency protest stated:

> This provision unnecessarily restricts the cure rights of the mortgagee beyond those typically provided to leasehold mortgagees in private sector transactions. For instance, the mortgagee's cure rights do not extend beyond the expiration of the cure period for the lessee. Additionally, Condition 23.7 artificially limits the period in which the mortgagee can "postpone" termination of the Ground Lease to six months even where the mortgagee pays the Air Force all amounts necessary to cure the lessee's default and is otherwise diligently proceeding to cure all non-monetary defaults that the mortgagee is obligated to cure under the Ground Lease. In situations where the mortgagees are un-

able to implement a cure to a default within six months (e.g., where the mortgagee experiences delays in taking possession of the property for reasons beyond its control such as protracted legal proceedings), the mortgagees risk the forfeiture of their collateral and the investment reflected by their loans. This restriction is inconsistent with commercial practices for similar transactions and, upon information and belief, is not found in Army and Navy MHPI projects. [ ]. As described above, such repayment guarantees [ ].

AR 1282–83 (footnote omitted).

Actus argued that [ ].[9] AR 1284, 1302. Actus further stated that [ ]. *Id.* at 1285.

Actus also complained that the Air Force departed from the stated source selection process by categorically rejecting Actus' proposed revisions to the form legal documents when the RFP expressly contemplated modifications to those documents. Actus argued that "this departure [was] highly prejudicial to Actus since without the Air Force's willingness to accept Actus' proposed exceptions and modifications Actus' final proposal *will likely be rejected.*" AR 1285 (emphasis added).

> The letter concluded:
>
> Actus' purpose in bringing this protest is to permit Actus to *compete* for the Project *in a fair and open basis and to foster increased competition in the hopes of improving the housing for Air Force service members.* In this vein, Actus is willing and eager to enter into good faith discussions with Air Force officials to address resolution of the restrictive provisions in the transaction documents.

AR 1287 (emphasis added).

The Air Force met with Actus representatives on April 3, 2003, to discuss the agency-level protest and indicated its willingness to agree to a number of Actus' requested changes. AR 1407–09. On April 8, 2003, Actus transmitted comments on the Air Force's Supplemental Responses regarding the protest items, which included the requested revision to Condition 23.7.3 of the Lease. *Id.*

---

**9.** GMACCHC was also Hunt's proposed lender for the Hickam Project.

In a letter dated April 16, 2003, the Air Force agreed to make certain changes to the form legal documents in response to Actus' protest. AR 1421–22. That letter, signed by the Solicitation Officer, stated:

1. Attached you will find our responses to your communication of 8 April 2003 providing your suggested changes to the legal documents after our meeting of 3 April 2003. This is our final position on the five "deal breakers" originally identified in your 1 August 2002 communication to us and which are the subject of your agency protest alleging unduly restrictive "specifications" filed on 27 March 2003. We offer these changes in an effort to settle your agency protest before formal decision becomes necessary .... After your consideration of these changes we need to know the following so we can continue with the source selection process:

 a. Whether the agency protest filed on 27 March 2003 is withdrawn, and;

 b. Whether, after considering the attached [Supplemental Responses of the Air Force indicating which requests for revisions were allowed], there are any issues remaining with the legal documents that would prevent you from closing a deal with the Air Force if you are selected. When considering this question please assume that no further changes will be made in the legal documents prior to closing. Please do not qualify your answer with language hinging on the prospect of additional negotiations with the Air Force and anticipated additional changes. While we expect that additional negotiations may be necessary to conform the documents to the deal if you are selected and that certain changes may be agreed to be necessary, we will not commit at this time to make

any further changes in the legal documents.

2. We would appreciate answers to these questions by 21 April 2003.

AR 1421.

In the Air Force's revisions of April 16, the Air Force indicated that Actus' requested change to Condition 23.7.3 was allowed. The Air Force stated that "in an effort to address the bidder's concern, the [Air Force] will agree to modify Condition 23.7.3 as set forth below":

*23.7.3* The Mortgagee's Right to Postpone shall extend the date for the termination of this Lease specified in the Termination Notice for a period of up to six (6) months *(or such longer period as may be approved in writing by the Government, which approval shall not be unreasonably withheld) so long as the mortgagee promptly commences all steps necessary to cure any Defaults of the Lessee (excluding "personal defaults"), including such steps as may be required for the mortgagee to obtain possession of the Leased Premises, and diligently prosecutes such cure to completion.*[10]

AR 1402–3 (as amended at AR 1409, 1422) (emphasis added).

Actus agreed to withdraw its protest on April 18, 2003, stating:

We are pleased to notify you that we hereby withdraw our agency protest filed on March 27, 2003.

We understand that, *should our proposal be accepted by the Air Force, the legal documents will be revised to reflect the modification of the [ ] issues previously discussed as indicated in the attachments to your April 16, 2003 correspondence.* Furthermore, during a telephone conversation held ... this morning, *Actus confirmed that should its offer be selected the unresolved legal document issues would not prevent Actus from closing with the*

---

10. The underlining indicates the Air Force's added language. Plaintiff had also asked that Condition 23.7.3 be revised to allow for an extension of the Mortgagee's Right to Postpone beyond six months "[s]o long as the Senior Lender is taking all commercially reasonable steps to cure a Lessee default and is prosecuting those steps with

due diligence," arguing that such a change would make Condition 23.7.3 more reasonable given that the Ground Lease was the primary collateral securing the Senior Loan. AR 1175. In its March 13, 2003, response, the Air Force rejected Hunt's proposed revision to this term. *Id.*

*Air Force. We understand that the final resolution of those issues will take place in accordance with the terms of the solicitation.*

AR 1458 (emphasis added).

The Air Force did not disclose to Hunt the change it had granted Actus in response to Actus' agency protest, i.e., the extension of the Mortgagee's Right to Postpone in Condition 23.7.3 of the Lease.

On June 13, 2003, Actus and Hunt submitted final revised proposals to the Air Force. AR 5965–69, 5974–6218 (Hunt); 10060–10920 (Actus). Hunt proposed a Senior Loan in the amount of [ ] at an interest rate of [ ] percent. AR 5974–75. Actus' final revised proposal again included a loan commitment letter from GMACCHC. AR 10142–49. GMACCHC's [ ] from its September 2002 and March 2003 letters. AR 10143–10144, 10147. The amount of Actus' proposed Senior Loan [ ]. AR 10143.

Hunt submitted a "Final Revised Proposal," dated June 17, 2003, that proposed a Senior Loan of [ ]. AR 5971. On June 19, 2004, Hunt provided the Air Force with a revised commitment letter from GMACCHC, dated June 18, 2003, which valued the Senior Permanent Loan at [ ]. AR 6065. GMACCHC again indicated that Hunt would be charged the [ ] basis point Senior Loan Guarantee fee, and a[ ] percent Senior Loan origination fee. AR 6054, 6068.

### The Source Selection Decision

In the final evaluation Hunt and Actus received the same ratings in all evaluation categories: [ ] for all Volume III criteria, [ ] for all Volume IV and Volume V criteria and [ ] in Performance Risk. AR 1565, 1590.

The Air Force selected Actus as the Successful Offeror on August 22, 2003. The Source Selection Decision Document (SSDD), dated August 22, 2003, explained that both offerors had furnished outstanding proposals at reasonable Government scored costs, had [ ] past performance and performance risk ratings, [ ] ratings and received identical ratings in all factors of Volumes III, IV, and V,

as well as identical performance risk ratings in Volume II. AR 1540, ¶ 7. The SSDD explained that Actus was selected because its proposal, although scored the same as Hunt's, had certain advantages.

The SSDD stated that Actus' Volume III was better overall because it included [ ]. AR 1540, ¶ 8. These strengths were found to more than offset Hunt's [ ].

The SSDD noted that Hunt's Volume IV, in comparison to Actus' proposal, included [ ]. The strengths of Hunt's proposals, however, were offset by the strengths of Actus' Volume IV, which included a superior approach to: [ ]. Also, Actus' Volume IV was given additional evaluation credit for an enhancement not required by the Solicitation [ ].[11] AR 1540–41, ¶¶ 9–10.

With respect to Volume V, Real Estate Management, the SSDD stated that Actus' proposal had the advantage [ ]. In particular, the SSDD noted that [ ]. Despite Hunt's more favorable terms [ ], the SSDD stated that Actus' Volume V advantages rendered it superior to Hunt's. AR 1542, ¶ 14.

Although both offerors received a Performance Risk rating of [ ]. AR 1542, ¶ 15.

In advising Hunt of the selection decision, the Air Force stated:

> If, for whatever reason, the Government is unable to close this real estate transaction with the current Successful Offeror, your proposal, which achieved the second highest overall "best value" rating in the competition, would stand next in line for the transaction closing pursuant to RFP paragraph 5.1.4.4.

AR 1543.

### Post–Selection Changes to the Form Legal Documents

The Solicitation envisaged that the form legal documents would need to be revised to resolve administrative details after the selection of the SO. AR 66. After the selection of Actus as the SO, the Air Force and Actus entered into negotiations and attempted to

---

11. The SSDD noted that Actus' Volume IV proposal contained the following other advantages

[ ]. AR 1541, ¶¶ 11–12.

close the transaction. In the course of those negotiations, a number of changes were made to the Lease and to other form legal documents as follows.[12]

### Multi–Phase Approach

Condition 7 of the Lease as revised to reflect the post-selection negotiations between Actus and the Air Force provided that the Lease may be terminated without any cost or liability to the Government in the event that the parties fail to agree on the "Phase I" plans within the time period specified in Condition 17, as opposed to the "Final" plans, and reflected Actus' suggested approach that the project be broken up in to four phases. AR 12,802. The "Phase I" plans referred to in the revised Condition 7.3.1 were narrower in scope than the "Final" plans. Condition 17 underwent substantial revision, in large part to add this "phased" approach to the project. A number of the original provisions of Condition 17 of the form legal document were deleted and provisions defining each of the four phases were added at Condition 17.1.1. AR 12,821–22.

### Dispute Resolution Provisions

New dispute resolution provisions providing mechanisms for resolving disputes before the Government could exercise its right to terminate the Lease for failure to agree on the plans were added to Condition 17 at 17.2.5–17.2.7. AR 12826–27. The amendments gave the Lessee thirty days following notice of the Government's rejection of its plans to submit revised proposed plans. In the event that the Lessee failed to correct the plans to the Government's satisfaction within the thirty day cure period, the revised Condition 17.2.7 provided that before the Lease could be terminated for failure to agree on the plans, the Government or the Lessee could, on or before the termination date specified in the Termination Notice, submit the matter to the Secretary of the Air Force for resolution by written determination. Should the Secretary issue a determination adverse to the Lessee, the Lessee was given a second thirty-day cure period within which to provide plans which were satisfactory to the Secretary, or such longer period as may be reasonably required so long as the Lessee commences remedial efforts within such thirty day period and diligently pursues such efforts until the matter is remedied. AR 12,826–27.

As noted, both Hunt and Actus argued that Condition 23.7.3 of the Lease be changed to extend the Mortgagee's Right to Postpone Termination of the Lease by the Air Force beyond six months. While Hunt's request was rejected by the Air Force and later dropped by Hunt, the Air Force changed the term for Actus as a result of its agency protest. AR 1175, 1255–1262, 1403, 1409, 1422. The "final" version of Condition 23.7.3 that the Air Force and Actus will use to close the deal reads as follows:

> *23.7.3* The Mortgagee's Right to Postpone shall extend the date for the termination of this Lease specified in a Termination Notice for a period of up to six (6) months or such longer period as may be requested by the mortgagee and approved by the Government, which approval shall not be unreasonably withheld; provided, however, that if the date for the termination of this Lease is extended pursuant to the Mortgagee's Right to Postpone, such extension shall remain effective only so long as the mortgagee (i) promptly commences all steps reasonably necessary to cure the Default of the Lessee specified in the related Termination Notice (excluding "personal defaults"), including such steps as may be required for the mortgagee to obtain possession or control of the Leased Premises, and diligently prosecutes the same to completion; and (ii) provides the Government with monthly updates in writing that describe in reasonable detail the steps the mortgagee has taken (and will take in the future) to cure any such Default, and the anticipated time-frame for curing such Default.

AR 12,845.

### Base Closure Provisions

Condition 20 of the Lease required the Lessee to acknowledge that "Referred Tenants," certain enlisted service members and referrals, were the intended tenants of the

---

12. These changes are found in the blackline "draft final documents". AR 12,789–13,558.

Development and that it would rent homes to "Other Eligible Tenants" only as expressly provided for in Condition 20.7. AR 487–88. There was no provision in Condition 20 of the Lease in the form legal documents that addressed the contingency of the closure of Hickam Air Force Base.

The Lease as negotiated between Intervenor and the Air Force includes provisions that address the potential risk of base closure and decreased occupancy of the Development. Two new conditions, 20.7.1 and 20.7.2, were added, with Condition 20.7.1 providing that should the occupancy rate of the "completed Housing Units in the Development . . . fall[ ] below ninety-five percent for any consecutive four-month period, . . . the Lessee shall have the right to offer vacant Housing Units for occupancy to Other Eligible Tenants . . . ." AR 12,839–40. New Condition 20.7.2 provided that in the event that the Government terminated use of Hickam, the Government and Lessee would "undertake good faith efforts to renegotiate Conditions 20.7 and 20.7.1 of this Lease in a manner mutually acceptable to both Parties." AR 12,840.

### Other Changes

Condition 17 was amended to expand the definition of "excusable delay" to expressly cover "acts of terrorism." AR 12,828. Condition 11.1.2 of the Lease regarding pest control was amended removing the term "essentially free from pests," and stating that the Lessee had to control pests "in accordance with industry standards and the Government's Integrated Pest Management Plan, whichever is stricter." AR 12,813.

Sub-section 20(h) which Hunt had repeatedly asked to have removed is now deleted from the Forward Commitment and has not been replaced.[13] AR 13,332. The "Governing Law" clause of the Intercreditor Agreement now provides that Hawaii law shall govern where there is no applicable Federal law or precedent. AR 13,480.

---

**13.** Sub-section 20(h), as it appeared in the form legal documents, read:

> At the time the Government makes the Direct Loan, neither the Borrower nor the Senior Lender shall be in default under this Commit-

### Actus' Post–Selection Proposal Revisions

On October 8, 2003, six days after the Air Force notified Actus that it had been selected as the Successful Offeror, the Air Force Solicitation Officer requested that Actus submit a final revised proposal. That letter stated:

> Request that you submit your final revised proposal.
>
> . . . .
>
> Due to the following changes, *request submission of a completely revised Volume III* [Business Arrangements, Financial Plan and Stucture].

■ *Include Additional 2004 OOP (Reduced Out–of–Pocket due to Cohen Initiative ).*

> Due to the timing of the loan closing, the Air Force is now allowing the Hickam MHPI to incorporate the 2004 OOP in the project revenue as BAH in lieu of it being included in the Windfall Income calculation. Based on recently released budgetary information, the 2004 OOP reduction is slated for 4 percent of the national median by rank. The remaining 3.5 percent OOP for 2005 will still be considered as Windfall Income.

■ *Include change in Fire & Police estimates*

> The revised estimate for fire and police reimbursement is now at $25,882 for the first year compared to the previous $474,600 annual estimate.

■ *Include any known tax impacts*

> Please address any tax savings on the real property or general excise tax estimates that can be incorporated in the final proposal. In addition, please identify in the proposal the SO's anticipated use of the tax savings.
>
> Furthermore, please state the SO's tax status/tax strategy for the project. In particular, please state the tax implications on the deposits or withdrawals from the reserve accounts.

---

ment, and no event shall have occurred which, subject to the passage of time or the giving of notice, or both, would result in such a default. AR 13,332.

*Due to the changes above, the final proposal may significantly change.* Please identify the changes to the final proposal in terms of scope and/or financial changes. While updating the financial aspects of the proposal, please consider, but not limit it to, the [e]ffect on the following:

- The changes affecting the 6 percent required equity contribution,
- The changes affecting the loan terms and/or amount for the permanent loan,
- The changes affecting the loan terms and/or amount for the Government Direct Loan—including an updated Borrower's Application,

In addition, we are interested in details for the out year renovation effort as follows:

- Details on how the withdrawals on the Reinvestment Account Schedule relate to the proposed reinvestment plan in Volume V;
- Ensure the income from units on-line for the out years reconciles with the downed units due to out year renovations;
- Ensure sources for the out year renovation costs are identified and incorporated in the pro forma and the final proposal;
- Ensure inclusion of demolition costs in the reinvestment account at the end of the lease; and
- Request to have more defined plans for out year renovations that will be included in the final proposal.

Based on a closing date of 1 December 2003, revised proposals are due COB Wednesday, 29 October 2003. Should the closing date change, I will extend the proposal due date.

AR 1595–96 (emphasis added).

Actus submitted its revised proposal on November 15, 2003. Included in the revised proposal were revisions to Volumes III, IV and V. The revised Volume III contained Actus' requests for modifications to the form legal documents that had previously been denied. AR 10,944. Paragraph 3.3.5 of Ac-

tus' revised Volume III stated in pertinent part:

### 3.3.5 Exceptions and Modifications to Legal Documents

These exceptions and modifications were addressed in the November 12, 2003 [14] meeting between the Air Force and Actus, and will be resolved prior to Financial Close.

AR 10,944.

On December 30, 2003, the Air Force asked that Actus submit a second "complete revised Volume III." AR 13,561–62. That letter stated:

Per discussions today, we are unable to properly consider your proposal changes to the Lockbox Agreement without a better understanding of ALL's Business & Financial Proposal. ALL's Business & Financial Proposal, dated 15 Nov 03, was not consistent with our verbal guidance to make no increases to the Direct Loan and was not evaluated.

Request submission of a complete revised Volume III

AR 13,561.

On March 11, 2004, the Air Force again requested that Actus submit another "final revised proposal," including financial and technical proposals and drawings. AR 13,-566–67. That letter noted that Actus' November 15, 2003, revisions to Volume IV contained changes to its design proposals that were not acceptable to the Air Force, including ceramic wall tile and laminate countertops as options because they were downgrades from the March 2003 submittal. AR 13,567.

On April 9, 2004, Actus submitted another "final proposal revision," AR 11,804–12,328, and a third post-selection "final proposal revision" on May 13, 2004. AR 12,329–12,785.

### Discussion
### *Jurisdiction and Standard of Review*

The Court has jurisdiction over pre-award bid protests pursuant to the Tucker Act, 28

---

**14.** The Administrative Record does not contain a record of the November 12, 2003, meeting re-

ferred to in Actus' revised proposal.

U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, 110 Stat. 3870. The Tucker Act grants the Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract . . . ." 28 U.S.C. 1491(b)(1).

■■■ The Court reviews an agency's decision in a bid protest action under the standards in the Administrative Procedure Act (APA). 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Under the APA standard, an award may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001)).

As the Federal Circuit recently explained: When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (citations omitted).

■■■ The protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law or procedure. *Info. Tech. & Applica-*tions Corp. v. United States*, 51 Fed.Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (*ITAC*); *Bannum, Inc. v. United States*, 60 Fed.Cl. 718 (2004); *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 648 (2003).

### The Motions to Dismiss

Intervenor seeks dismissal of this action on four grounds: 1) there is no final agency action to review; 2) Plaintiff lacks standing because it cannot show prejudice; 3) Plaintiff's failure to protest terms of the Solicitation during the procurement process renders this protest untimely; and 4) Plaintiff's protest impermissibly seeks relief from its own business decisions.

In ruling on a motion to dismiss, the Court is "obligated . . . to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995). In order to survive such a motion, Plaintiff bears the burden of showing by a preponderance of the evidence that the Court has jurisdiction over the claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002).

### Is The Selection of Actus Reviewable At This Juncture?

■■■ Intervenor argues that the protest is premature because the Air Force has not yet closed the subject transaction with Actus. Intervenor's Mot. to Dismiss at 6–7. The Solicitation envisaged the selection of a Successful Offeror followed by a period of the Air Force and the SO "finaliz[ing] the financing and administrative details for implementing all agreements to close the deal." AR 68–69. Plaintiff filed this protest after Actus' selection but before the form legal documents had been finalized or closing had occurred.[15]

Although the closing has yet to occur, the Air Force has represented to the Court that the form legal documents have been finalized and that the Air Force and Actus have an agreement in principle. The Air Force's Di-

---

15. Prior to the filing of any dispositive motions, the Court and the parties discussed the unusual posture of this action and agreed the Court would *not* review the matter until the Air Force and the Successful Offeror had finalized the form legal documents and were prepared to close the transaction—a necessary step before the Administrative Record could be compiled. Tr. of March 31, 2004 at 21, 25–26; Tr. of April 1, 2004 at 4.

rector, Real Property Office, Office of the Deputy General Counsel for Installations and Environment, certified in a declaration that the revised form legal documents submitted to the Court in connection with this bid protest are the versions of those documents that the Air Force is prepared to execute to implement the Project. Decl. of Derence V. Fivehouse, dated May 18, 2004 at 1. As such, the matter is ripe for judicial review, since the actions Hunt protests have been effected—the Successful Offeror has been selected, the post-selection finalization of the legal documents has been completed to the extent it can be and all that remains to be done is closing in· accordance with those documents. There is sufficient finality for the Court to review the action, and delaying review until the formality of a closing could impair the Court's ability to fashion relief.[16]

The Tucker Act gives this Court jurisdiction to render judgment in an action by an interested party objecting to a proposed award of a contract "without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). The Court routinely exercises jurisdiction over bid protests alleging that offerors have been improperly excluded from the competitive range in a negotiated procurement, prior to selection. *Pikes Peak Family Hous. LLC v. United States,* 40 Fed. Cl. 673, 677–78 (1998); *W & D Ships Deck Works, Inc.,* 39 Fed.Cl. 638, 642–43 (1997).

Intervenor contends that the Tucker Act does not give this Court jurisdiction over an agency procurement "midstream," because, under this Solicitation, even if the Court were to find that changed terms were illegal, the Court would be limited to ordering the Air Force and Intervenor to continue their negotiations "because the Court would have to remand to the Air Force to determine whether a lease without those terms satisfies its requirements." Intervenor's Reply at 2. Aside from the fact that Actus is confusing the Court's jurisdiction with its ability to fashion a remedy, the Solicitation here does not limit the Court as Intervenor

suggests. Hunt has alleged a pre-award violation, the relaxation of the six-month limitation on the Mortgagee's Right to Postpone Termination, which if proven, would render the competition which resulted in Actus' selection illusory. Remand for further negotiations between those two parties would merely perpetuate an alleged illegality stemming from the improper selection of an offeror based upon different requirements than those imposed on the only other competitor. The Solicitation does not eviscerate the Court's ability to fashion relief for this type of violation.

### Is Plaintiff An Interested Party?

■ In order to establish standing, a protester must show that it is an actual or prospective offeror whose direct economic interest would be affected by the award of the contract, i.e., that it was an interested party prejudiced by the award. *ITAC,* 316 F.3d at 1319; *AFGE, Local 1482 v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002). To establish prejudice, Hunt must show that there was a "substantial chance" it would have received the award but for the alleged errors in the procurement process. *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1328 (Fed.Cir.2004); *ITAC,* 316 F.3d 1312, 1319 (Fed.Cir.2003).

■ Plaintiff is one of two offerors in the competitive range, both were deemed "outstanding" and Hunt achieved the exact same technical ratings and risk assessment in the final evaluation as the Successful Offeror. Hunt has alleged that the award to Actus should be set aside because the Air Force improperly relaxed requirements in the form legal documents for Actus but not Hunt, such that the offerors competed on a different basis. Had there been a level playing field, Hunt clearly would have stood a substantial chance of winning.

Intervenor repackages its argument that if a violation were found, the Court would be limited to requiring the Air Force and Actus to continue negotiating, meaning that Plain-

---

**16.** The contracts resulting from this Solicitation do not contain termination for convenience clauses.

tiff could not reenter the competition, and thus that Hunt would have no substantial chance of award. This argument fails once again. The Court is not so constrained in fashioning a remedy, and the traditional remedy for an unequal playing field, a recompetition with offerors bidding to the same requirements, would give Hunt a substantial chance of award. Because Plaintiff had a substantial chance of receiving award, but for the Air Force's relaxation of material requirements for the only other offeror, it has standing to bring this protest.

### Is This Protest Untimely?

██ In addition to complaining that Plaintiff's protest comes too early, Intervenor, joined by Defendant, argues that Plaintiff's protest comes too late. They contend that Plaintiff's protest is untimely because Hunt failed to object to the terms of the Solicitation prior to Actus' selection as the SO. Intervenor's Reply Mot. to Dismiss at 7; Def.'s Opp. and Mot. to Dismiss at 11–22. This argument misconstrues Hunt's protest. Plaintiff does not allege that the terms of the Solicitation were themselves infirm. Rather, Hunt seeks to enforce the terms of the Solicitation and argues that the Air Force did not follow those terms in selecting Actus. *See MVM, Inc. v. United States*, 46 Fed.Cl. 126, 131 (2000) (stating that "the agency did not inform the bidders the requirements had changed until after the agency had awarded the contract. Accordingly, as a simple matter of logic, it was impossible for MVM to [protest this violation] before the contract was awarded"). Because Hunt challenges the Air Force's compliance with its Solicitation in selecting Actus and permitting material post-selection revisions to the form legal documents and to Actus' proposal, the protest could not have been lodged before the selection of Actus and its aftermath. As such, the protest is timely.[17]

### Has Plaintiff Waived Its Right To Protest Because It Failed To Continue To Request Changes To The Form Legal Documents?

██ Intervenor contends that the Court should dismiss this protest because Plaintiff made a business decision to stop pursuing some of its requested modifications, and waived its right to protest the Air Force's modification of those terms for Actus. The Air Force and Actus attempt to characterize the Air Force's decision to amend Condition 23.7.3 for Actus but not Hunt solely as a matter of Hunt's own doing, claiming that Hunt voluntarily withdrew and abandoned its request for a change to this provision, thus relieving the Air Force of any obligation to make this change for Hunt. The Air Force cannot so easily shift the onus to Hunt. had firmly objected to Condition 23.7.3 as increasing its risks twice and sought modification of that term, but the Air Force summarily rejected its requests. Hunt did not drop its requested modifications of its own accord, but rather because the Air Force expressly warned Hunt that refusing to accept the terms unmodified would adversely affect its evaluation. The Air Force told Hunt that if it required the proposed modifications, which the Air Force had rejected, "such modifications shall cause Hunt's proposal to be evaluated less favorably or rejected." AR 1167. The Air Force actively discouraged Hunt from seeking further modifications by that warning. As such, Hunt's decision not to press for these modifications does not bar its right to protest now.

### Supplementation of the Administrative Record [18]

Plaintiff seeks to supplement the Administrative Record with six declarations, three from James M. Hunt, executive vice president of Plaintiff, one from Roberto J. Cava-

---

**17.** The Air Force argues that CICA and the FAR do not apply to MHPI Projects, as though this somehow bolsters its argument that the protest was untimely. Defendant's Opposition and Motion to Dismiss at 16–22. The Court finds that the issue of whether these authorities apply or not has no bearing on the timeliness of Hunt's protest. The Court asked counsel for Defendant if the inapplicability of CICA and the FAR suggested another basis for dismissal, but counsel replied that it did not. Tr. of July 1, 2004 at 89–

90 ("We're not saying that the Court can't entertain this because CICA and the FAR don't apply")

**18.** On May 17, 2004, Defendant filed the Administrative Record in thirteen volumes, including the final versions of the form legal documents that the Air Force was prepared to sign, and filed three additional volumes on May 18.

zos, Plaintiff's expert economist, and two from Daniel Ray, an executive at GMACCHC, Plaintiff's proposed lender, to demonstrate how it was prejudiced by Defendant's actions.

■ Because bid protest actions are subject to the APA standard of review, the Court is generally limited to the administrative record, unless there is a genuine need to supplement that record arising from the particular circumstances. *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 648 (2003). The Court has recognized such need for supplementation in cases where prejudice is at issue. As this Court stated in *Gentex*, 58 Fed.Cl. at 649:

> [I]n attempting to demonstrate prejudice, [the declarant] explains how Gentex would have changed its proposal were it not for the Air Force's illegal actions. Such an attempt to show prejudice is also an appropriate basis for supplementing the record. *See Strategic Analysis, Inc. v. United States Department of the Navy*, 939 F.Supp. 18, 23 n. 7 (D.D.C., 1996) (acknowledging that, while normally judicial review of a bid protest is limited to the administrative record, the submission of an affidavit of a company executive is a proper way to demonstrate prejudice) (citing *Data General Corp. v. Johnson*, 78 F.3d 1556, 1563 (Fed.Cir.1996)).

Mr. Hunt explained how the Lease's termination provisions and limitation on the lender's right to postpone termination increased Hunt's direct proposed costs for the Hickam Project as well as Hunt's and its lender's risk. Supplemental Hunt Decl., ¶¶ 12–14.

Dr. Cavazos testified regarding the prejudice suffered by Plaintiff because of the changes made to the form legal documents. The Administrative Record is under seal and Mr. Hunt, who is not admitted under the Protective Order, could not review the pre- or post-selection changes to the form legal documents, and could not address precisely how those changes prejudiced Plaintiff. Thus, Plaintiff required an expert consultant who could review and assess these materials to render an opinion on the impact of these changes on Hunt.[19]

Plaintiff submitted the declaration of Daniel Ray, a senior vice president and managing director of GMACCHC, the company that was to provide Plaintiff's Senior Loan, to explain the financing for the Project as well as risks presented to Plaintiff's lender by the original termination provisions in the Lease which resulted in a requirement for "additional backup credit support" in the form of a guaranty. Intervenor subsequently submitted a supplemental declaration of Mr. Ray to clarify some of the statements in Mr. Ray's first declaration.

Because the six declarations and the deposition of Dr. Cavazos assist the Court in understanding the financing for the Project and address Plaintiff's alleged prejudice, the Court allows supplementation of the record with these materials.

### Has Plaintiff Established That The Agency's Conduct In Selecting Actus Was Arbitrary Capricious, Irrational Or A Violation of Statute or Regulation?

■ Defendant and Intervenor argue that the Competition In Contracting Act

19. The Court also authorized the deposition of Dr. Cavazos and similar depositions for any experts of Defendant and Intervenor. The Court orally granted Plaintiff leave to supplement the record with expert testimony from Dr. Cavazos, and accepts his declaration and deposition into the record.

> On June 7, 2004, Plaintiff filed an Objection to Defendant's Application for Admission to Protective Order by Expert Consultant or Witness. After hearing argument, the Court denied access to Defendant's consultant, Michael J. Ruby, under the Protective Order because he refused to execute the Court's standard application for access. Order of June 8, 2004. Mr. Ruby, however, had worked on the Hickam Project as a consultant to the Air Force and had already been allowed access to protected

documents. Hunt's Release of Proprietary Information, executed on September 9, 2002, authorized Mr. Ruby, a subcontractor of Ernst & Young, to have access to all of its submittals in the underlying procurement including its proprietary information and evaluation information. Because Plaintiff's prior release constituted a knowing and intentional waiver of any objection to access by Mr. Ruby to information covered by the release, the Court ruled that Plaintiff had waived any objection to Mr. Ruby's access for purposes of this proceeding, and clarified that Mr. Ruby could continue to have access to Plaintiff's proprietary information under the terms and conditions agreed to in the September 9, 2002, Release, but not under the auspices of the Court's Protective Order.

(CICA) and the Federal Acquisition Regulation (FAR) do not apply to this transaction, and therefore the Air Force cannot be found to have violated statute or regulation. The legal issue of whether CICA and the FAR apply is a thorny one, not necessary to the resolution of this expedited case. The Court's authority to overturn agency action in the bid protest context is not limited to violations of statute or regulation. Rather, this Court may set aside a procurement which lacks a rational basis or results from a prejudicial violation of procurement procedure. *Banknote*, 365 F.3d at 1351. The agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis. *See, e.g., LaBarge Prod., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995) (recognizing "the bastion of federal procurement policy that all offerors must possess equal knowledge of the same information in order to have a valid procurement."). The agency's failure to follow its own selection process embodied in the Solicitation is also a prejudicial violation of a procurement procedure established for the benefit of offerors. *Banknote*, 365 F.3d at 1351.

This Court's bid protest jurisdiction is no longer premised on the theory of the breach of an implied-in-fact contract. Nonetheless, it has long been held and is still recognized that the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing. *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409, 412 (1956) ("It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted. No person would have bid at all if he had known that 'the cards were stacked against him.'"). As the Federal Circuit recognized, "[t]he government is said to breach the implied contract if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998), (citation omitted).

Thus, the Government's issuance of a Solicitation and offerors' submission of responsive offers created an implied-in-fact contract requiring fair dealing on the part of the Government. Moreover, the Solicitation expressly provided that the Air Force would use "fair" procedures for the evaluation and selection. AR 6. As such, the Court has a legal basis to sustain this protest independent of any statutory or regulatory violations, so the applicability of CICA and the FAR is immaterial.

### Pre–Selection Changes to Solicitation Terms

Plaintiff alleges that the Air Force relaxed the six-month limitation on a mortgagee's Right to Postpone Termination of the Lease for Actus after refusing to do so for Plaintiff. Defendant responds that the Solicitation was not governed by CICA or the FAR, and did not limit offerors to proposing on the same basis. Def.'s Statement of Facts ¶¶ 2, 3. Defendant submits that the Solicitation allowed offerors to propose alternatives or a different scope of work than that described in the Solicitation, and stated that the Government could accept or reject such alternatives. The fact that the Solicitation permitted offerors to be creative in their solutions did not mean that the Government could apply different *requirements* to offerors. The form legal documents contained conditions which were to be met. The Air Force's relaxation of a condition and extension of the six-month limit on postponing termination for Actus was not attributable to any enhancement in Actus' proposal—it was a modification of the ground rules on which offerors were competing, significantly affecting risk regarding termination of the collateral securing the financing, i.e., the Lease.

Granting Actus' request to relax the six-month limitation on postponing termination, after having denied Plaintiff's identical request and having admonished Plaintiff that its evaluation would be adversely affected were it to require such modifications, was arbitrary. As noted above, Plaintiff had asked for this same modification twice, but the Air Force summarily denied it both times. Then Hunt dropped this request after the Air Force told Hunt that if it persisted in

requesting rejected modifications, its proposal would be downgraded or rejected. Contrary to Defendant's and Intervenor's contentions, the record does not demonstrate that Hunt intentionally abandoned this request because it no longer wanted that relief—it accepted the risk associated with Condition 23.7.3 rather than undertaking another risk—having its proposal downgraded or rejected.

By allowing the change to Condition 23.7.3 for Actus after denying Plaintiff the same change, the Air Force violated the "fundamental principle of government procurement . . . that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the Solicitation." *TLT Constr. Corp. v. United States*, 50 Fed.Cl. 212, 216 (2001). Further, as the Comptroller General has recognized, it is a fundamental rule of competitive procurement that all offerors compete on an equal basis by proposing to the same terms, conditions and specifications. *Canberra Industr., Inc.*, B–271016 (June 5, 1996), 96–1 CPD ¶ 269, 1996 WL 302696 (all offerors must be provided a common basis for submission of proposals); *Bishop Contractors, Inc.*, B–246526 (December 17, 1991), 91–2 CPD ¶ 555, 1991 WL 280099 (bidders have a right to assume that the essential requirements of a solicitation are the same for all competitors); *Cylink Corp.*, B–242304 (April 18, 1991), 91–1 CPD ¶ 384, 1991 WL 86975.

The onerous six-month limitation term, which Actus termed a "deal breaker," was eliminated for Actus by the settlement of Actus' agency protest, but Hunt continued to be saddled with it. The relaxation of this provision would have decreased the risk to the lender. As a result, Plaintiff and Actus submitted FPRs based on fundamentally different assessments of the risk inherent in the Project. As Hunt's lender testified, increasing a lender's risk exposure had a direct consequence to a borrower—the risk is passed on to the borrower in the form of an increase in the financing costs, either through a higher interest rate or because of the requirement that credit enhancement, such as a guarantee, be obtained. Ray Decl. ¶ 12. Risk was an evaluation consideration.

The Solicitation stated that the standard required for financial proposals would be met when "[t]he Offeror's proposal shows that the financial risk (e.g., default, interest rate, etc.) to the Project is reasonable. The lower the risk the more favorable this factor will be evaluated." AR 86. The pre-selection change to Condition 23 of the Lease meant that the risk for Plaintiff was greater than that for Intervenor, making it impossible for the SSET to apply that evaluation factor fairly.

In relaxing Condition 23.7.3 for Actus, but not Hunt, the Air Force also violated its Solicitation by failing to amend this condition. The Solicitation imposed an obligation on the Air Force to amend the Solicitation with "any information necessary in submitting offers" or if the lack thereof "would be prejudicial to any other prospective offerors." Because this Condition increased the risk for lenders and concomitantly increased the cost of financing for offerors, its relaxation was significant and the inability of an offeror to propose to this relaxed term, prejudicial. As such, the Solicitation required amendment of this provision.

Intervenor contends that Hunt was not prejudiced by the extension of the six-month limitation of the Mortgagee's Right to Postpone Termination in Condition 23.7.3 because the Lease already provided the mortgagee with this right under Conditions 7.1.1 and 23.7. Intervenor's Reply to Pl.'s Response to Intervenor' Cross–Mot. for J. on the AR at 7–8. Contrary to Intervenor's argument, Conditions 7.1.1 and 23.7 did not operate to confer the same rights as Condition 23.7.3. Condition 23.7 gave the mortgagee, upon receiving a notice of termination, "any and all rights of the Lessee with respect to *curing of any Default,* but . . . also . . . the right to postpone and extend the specified date for the termination of the Lease . . . ." Condition 7.1.1 provided the Lessee with a thirty-day period to cure a violation of the Lease *before* the Government could *declare* a default. Thus, the six-month limitation of the Mortgagee's Right to Postpone Termination, could not have been extended by Condition 7.1.1.

### Relaxation of Material Solicitation Requirements Post–Selection

 Defendant and Intervenor argue that the Solicitation clearly stated that post-selection "amendments" would be made to the form legal documents, and, therefore, that the post-selection changes to the form legal documents did not violate the Solicitation.

Defendant and Intervenor overstate the Solicitation's provisions. Section 3.2.1, provides that "[t]he Government anticipates that revisions may be made to instruments [the form legal documents] for the purpose of ensuring that the documents are consistent with the Selected proposal and the Government's requirements for the development." AR 15. The following section, 3.2.2, however, provides that "[t]he SO shall be required to execute each of the applicable instruments identified in 3.2.1 [the form legal documents], *with provisions substantially identical to the Appendices referred in 3.2.1.*" AR 15 (emphasis added). Section 4.9, "Resolution of Administrative Details," further clarified the nature of permissible revisions:

> The Government anticipates there will be a need to resolve additional *administrative details* after selection of the SO. This may include finalizing the remaining administrative financial contingencies and completing all agreements in order to close with the SO. *This post-selection process to resolve details will not encompass issues that affect the basis on which the source selection decision was founded.*

AR 66 (emphasis added).[20]

As it appeared in the Solicitation, Condition 17 provided that if the Government had not approved the proposed "Final" plans within 60 days after the Lessee's initial submittal, the Government could terminate the Lease, without any cost or liability without expressly affording the Lessee an opportunity to correct deficiencies in its Final plans

prior to termination. Hunt had asked for deletion of this provision or that it be made subject to dispute resolution procedures, but the Air Force had refused.

After selecting Actus as the Successful Offeror, the Air Force agreed to dispute resolution provisions that would allow Actus a thirty-day cure period after rejection of its Phase I plans, followed by a review by the Secretary of the Air Force, followed by another thirty-day cure period where the Secretary made an adverse determination. The Air Force also narrowed the scope of the plans that had to be finalized and set out a "phased" approach to the development of the Hickam Project, with the result being that the Government and Actus only had to come to agreement regarding Phase I of the plans, not the Final plans.

Condition 20 of the Lease, "Tenants and Leasing," required the Lessee to acknowledge and agree that "Referred Tenants"[21] were the intended tenants of the Development and that it would rent homes in the Development to "Other Eligible Tenants" only as expressly provided for in Condition 20.7 of the Lease. AR 488. Condition 20.7 placed a number of limitations on the Successful Offeror's right to lease to tenants other than military personnel and made no provision for the possibility that Hickam Air Force Base might be closed. Hunt asked that this risk be addressed, but its request was denied.

After the selection of Actus, however, the Air Force inserted provisions to deal with this risk, new Conditions 20.7.1 and 20.7.2. AR 12,839–40. New Condition 20.7.1 liberalized the conditions under which the Lessee could rent homes at Hickam to "Other Eligible Tenants" should the occupancy rate drop below 95%. Condition 20.7.2 addressed closure of Hickam Air Force Base, and required that the Lessee and the Government under-

---

**20.** Similar language is found in Section 5.1.4.4, addressing the source selection process:

> Next, the Government will request final proposal revisions and then reassess the proposals, select the Offeror whose proposal provides the best value to the Government, and *finalize the financing and administrative details for implementing all agreements to close the deal.*

AR 68–69 (emphasis added).

**21.** "Referred Tenants" were defined as certain enlisted service members other individuals referred by the Installation's Housing Management Office. AR 487.

take good faith efforts to renegotiate the conditions that govern to whom the Lessee could rent properties on the Base should the Government "terminate use of the Installation."

Hunt sought to have "acts of terrorism" expressly included in the definition of "excusable delay," but this was denied twice by the Air Force. After the selection of Actus, the Air Force amended Condition 17.1.3.3 to include "acts of terrorism" as an excusable delay, clarifying the original definition.

The Air Force permitted Actus to provide that Hawaii law would govern in the event there was no federal precedent, and adopted an objective definition for the pest control provision, rather than mandating that the Development be "essentially free from pests"—in both ways adding clarity and certainty to the transaction.

The Air Force and Actus contend that Amendment 2 to the Solicitation permitted these post-selection revisions to the form legal documents because it "modified the Solicitation to require the Selected Offeror to execute the legal documents with the changes that the Offeror requested and to which the Air Force agreed." [22] These parties misread Amendment 2, which clearly did not authorize these post-selection revisions. That Amendment merely required offerors to "identify in writing any *proposed* exceptions or modifications to the terms of" the form legal documents." AR 553. That Amendment did not say that an individual offeror's requested modifications to these form legal documents, if accepted, would be incorporated into the legal documents executed at closing, without amending the Solicitation to reflect revisions which would affect the basis of award. This Amendment had to be read in context with the Solicitation as a whole. Here, the Solicitation imposed an obligation on the Air Force to keep the revisions to the form legal documents in the realm of administrative details which would not affect the basis for award and required that the revised legal documents executed at closing be "substantially identical" to the form legal documents on which offerors based their proposals. Allowing these numerous changes to the form legal documents post-selection violated those Solicitation provisions. It is fundamental that evaluation and contract award must be made in accordance with the terms and conditions in the Solicitation. *Lykes Bros. Steamship Co.,* B–236834.4 (July 23, 1990), 90–2 CPD ¶ 62, 1990 WL 278254; *American President Lines, Ltd.,* B–236834.3 (July 20, 1990), 90–2 CPD ¶ 53, 1990 WL 278255.

In addition, these revisions should have been the subject of a Solicitation amendment since they included "information necessary in submitting offers," the lack of which "would be prejudicial to any other prospective Offerors." AR 15, 64. This Solicitation requirement reflects caselaw. This Court has recognized that where changes render the contract as awarded materially different from the contract as solicited, the solicitation must be amended. *XTRA Lease, Inc. v. United States,* 50 Fed.Cl. 612, 621 (2001); *GraphicData, LLC v. United States,* 37 Fed. Cl. 771, 784 (1997). The requirement to amend a solicitation prevents the field of competition from being unfairly changed where "the modification allows the awardee to perform the contract in a manner that disappointed bidders could not have anticipated from the terms of the Solicitation." *GraphicData,* 37 Fed.Cl. at 784 (citing *Bangar Contractors Corp.,* Comp. Gen. Dec. B–240,071 (October 16, 1990), 90–2 CPD ¶ 295), 1990 WL 278547.

### Did The Air Force Violate the Solicitation by Permitting Actus to Revise Its Proposal Post-Selection?

■ The Solicitation contemplated post-selection revisions to the form legal documents in this transaction and some level of discussions between the SO and the Air Force to finalize administrative details, but these revisions and discussions had to comport with the other provisions of the Solicitation requiring that selection would be based upon the final proposal revisions submitted and evaluated resulting in the Source Selection Decision and not wholly different financial proposals submitted months after selec-

---

**22.** Def.'s Counter–Statement of Facts at 13, ¶ 27.

tion.[23]

Condition 16 of the Lease provided that the Selected Proposal "and any amendments or supplements thereto" would be incorporated into and made part of the Lease. However, nothing in the Solicitation permitted the Air Force to request and accept further "final proposal revisions" post-selection; it permitted only that "administrative details" be resolved, with provisions of the form legal documents at closing being "substantially identical" to those that appeared in the Appendices of the Solicitation "for the purpose of ensuring that the documents are consistent with the Selected Proposal." AR 15 and 66. Further, the Solicitation provided that proposal revisions "may not be considered" unless received "before selection" except for late modifications that made a proposal more favorable to the Government. AR at 66.

Not only was Actus given three opportunities to submit improved proposals after selection, the Air Force specifically asked Actus to submit completely revised versions of Volume III the most heavily weighted component of the evaluation and noted that "the final proposal may significantly change." This prejudiced Hunt both because it gave Actus an edge Hunt did not receive and because the Solicitation provided that, in the event that Actus and the Air Force were unable to close the transaction *within 60 days of notification of selection,* the Government reserved the right to select the next highest-rated offeror, i.e., Hunt. AR 66.

Here, the Air Force allowed Actus to revise the proposal post-selection which had been the basis of its selection and best value assessment. It is well established that the contract awarded must be the one for which the offerors have competed. *St. Mary's Hosp. and Med. Ctr. of San Francisco, California,* B–243061 (June 24, 1991), 91–1 CPD ¶ 597, 1991 WL 126509; *Corbetta Construc-*

tion Co., 55 Comp Gen. 201 (1975), 75–2 CPD ¶ 144, 1975 WL 11636. The post-selection revisions to Actus' proposal violated the Solicitation and prevented the Air Force from selecting the offeror whose offer was the most advantageous to the Government. The continued revisions to Actus' proposal subsequent to the Source Selection Decision rendered competition underlying that decision illusory.

### Has Hunt Demonstrated Prejudice?

██ To prevail in a bid protest, a protestor must show not only a significant error in the procurement process, but also that the error prejudiced it. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (citing *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1556 (Fed.Cir.1995)). The record demonstrates that Hunt was prejudiced by the pre-selection and post-selection changes to the form legal documents and revisions to Actus' proposal.

Defendant and Intervenor argue that Plaintiff has failed to show that it could have received better financing terms from GMACCHC had it obtained the same changes to the form legal documents as Actus and that GMACCHC would have required a guarantee from Plaintiff regardless of the changes found in the draft final documents. This is squarely refuted by the testimony of Hunt's lender and correspondence between Hunt's lender and the Air Force.

A senior vice president and managing director at GMACCHC, Daniel Ray, familiar with Plaintiff's financial proposal for the Hickam Project, testified in his declaration that:

In connection with their respective underwriting analysis relating to the Senior Loan and the Senior Loan Insurance Policy, GMACCHC and Ambac[24] concluded that the construction related risk of tenant

---

**23.** The Solicitation did contemplate a type of post-award discussions to "finalize the financing and administrative details." AR 68. Paragraph 5.1.4.4 referenced these discussions twice: "If the Government is unable to finalize the financing, administrative details and changes to legal documents with [the successful] offeror within a reasonable period of time, it reserves the right to terminate its *discussions* and begin *discussions* with the next offeror providing the best value to

the Government."AR 69. (emphasis added). Again, the extent of discussions permitted by this clause must comport with the Solicitation's other limitations on post-selection changes to form legal documents and proposals.

**24.** AMBAC acted as Hunt's credit enhancer on the Hickam Project.

default during the initial development period and the other termination rights afforded the landlord under the ground lease during the initial development period, together with the six month limitation on the mortgagee's time to cure [Condition 23.7.3 of the Lease] resulted in an unacceptable ground lease termination risk to the lender and credit enhancer of the Senior Loan during the initial development period.

To mitigate these risks, GMACCHC required in its commitment letter that Hunt provide additional backup credit support for Ambac and Ambac's liability under the Senior Loan Insurance Policy during the initial development period. The additional back up credit support was to be in the form of a financial guaranty from GMACCM in favor of Ambac pursuant to which GMACCM would agree to reimburse Ambac for any amounts Ambac was obligated to pay under the Senior Loan Insurance Policy during the initial development period.

Had the ground lease been in a form that did not create the termination risks described above, GMACCHC and Ambac would not have required the GMACCM guaranty.

Pl.'s Mot. to Supplement the AR, Attachment 2, Declaration of Daniel Ray (Ray Declaration) at 3–4.

Other contemporaneous documentation from GMAC also indicates that this lender could have provided more favorable financing terms to Plaintiff had it received the same changes which the Air Force allowed Actus to make to the form legal documents. In an e-mail dated February 7, 2003, Rob McIntire, another employee of GMACCHC, responded to a question from the Air Force about how it could increase participation in the housing privatization program as follows:

I told him AF termination provision puts significant risk on lender which is passed on to developer. Many developers are uncomfortable with this balance sheet risk. It's a great deal for the AF [Air Force] (as compared to other services) if they can get developers to accept their terms but it does limit the playing field. The financing fees are a little higher because you are offloading your risk and there is an upfront cost for the lender to assume this risk. He asked how we address this if AF is not willing to remove this risk from developer. I told him they could hold the developer to same standard and completion deadlines with removal of developer for failure rather than termination of ground lease. This protects lender and allows us to bring in new developer. Lender would need a minimum of 18 months to cure and unlimited rights to cure so long as we were diligently pursuing.

Suppl. Hunt Declaration, June 17, 2004, Attachment A at 2. Although the revision to Condition 23.7.3 did not grant Actus 18 months to cure outright, an extension of this duration was possible under that revision if the mortgagee was diligently pursuing a cure.

Dr. Cavazos, Plaintiff's expert economist also testified that "[t]his provision [Condition 23.7.3 of the Lease], again the ability to postpone being limited to not more than six months, is different, a completely different level of risk than being [able] to basically postpone indefinitely." Deposition of Robert J. Cavazos, June 8, 2004 at 48. Dr. Cavazos opined that "the ability to request more time decreases the financial risk falling out of this provision 23.7.3," that Hunt was competitively disadvantaged in relation to Actus in connection with 23.7.3 because "Hunt is basically harboring and working a project under the constraint that the cure period is limited to six months or less." Id. at 50–52. Dr. Cavazos explained: Based on my understanding that Actus is able to have ... six months or more for a cure period compared to six months or less, absolutely, yes. It's a competitive disadvantage. I don't think that's controvertible in any way, shape or form ...." Id. at 53–54. Dr. Cavazos further expected that "the senior loan guarantee fee would be higher if the cure period in 23.7.3 is no more than six months as opposed to being greater than six months." Deposition of Robert J. Cavazos, June 8, 2004, at 78.

Mr. Hunt testified that as a result of the guaranty and other assurances required due to the termination provisions and the limita-

tion on lender cure rights, Hunt's direct proposed costs were increased by $10 million. Suppl. Hunt Declaration at ¶12. This amount, according to Mr. Hunt, consisted of direct costs which included [ ] for the GMACCM Senior Loan guaranty fee, a guaranty origination fee for [ ], and a[ ] basis point [ ] increase in the interest rate Plaintiff was to be charged on the Senior Loan due the increased risk profile of the transaction that necessitated the Senior Loan guaranty, [ ]. *Id.* at ¶13. A non-guaranteed loan structure, Mr. Hunt concluded, would have permitted Plaintiff to reduce the amount of its Government Direct Loan and lower its "scored cost"[25] for that loan, improving Hunt's chance of award. *Id.* at ¶18.

Although Intervenor attempts to argue here that the change to Condition 23.7.3 of the Lease was not significant, it made different claims in its agency protest arguing: (1) the provision was "inconsistent with commercial practices for similar transactions"; (2)[ ]; (3)[ ]; (4)[ ]; and (5)[ ]. AR at 1283–85, 1302. Having maintained that Condition 23 of the Lease [ ], Intervenor's position that the limitation in Condition 23 was insignificant and its change nonprejudicial is untenable. Further contributing to Hunt's prejudice is Actus' admission in its agency protest that "without the Air Force's willingness to accept Actus' proposed exceptions and modifications, Actus' final proposal will likely be rejected." AR 1285.

Defendant and Intervenor contend that there was no prejudice to Hunt here because of the numerous other advantages the Source Selection Decision cited for Actus' proposal, such as community, architectural, and environmental considerations. Although these factors justify the Source Selection Decision on the flawed evaluation ratings and scores presented, they do not begin to suggest that Hunt would not have had a substantial chance for award absent the relaxation of the form legal documents made for Actus.

In sum, the pre-selection change in the provision permitting an extension of the six-month Mortgagee's Right to Postpone which

was afforded to Actus in settlement of its agency protest but not to Hunt would have decreased the risk to Hunt's lender and the cost of Hunt's financing. The changes to several other provisions post-selection either relaxed or clarified additional requirements for Actus, further prejudicing Hunt. Finally, affording Actus but not Hunt an opportunity to completely revise its Financial Proposal after selections necessarily prejudiced Hunt.

### What Should The Remedy Be?

Plaintiff has asked the Court to enjoin the Air Force from closing the transaction with Actus until it has given Hunt an opportunity to submit a revised proposal in response to the numerous material changes, performed a re-evaluation of the proposals, and issued a revised source selection decision.

■ Injunctive relief is an extraordinary remedy. *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) ("[I]njunctive relief [is] awardable ... only in extremely limited circumstances.") (citation omitted); *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993) (a preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted"). A court may issue a permanent injunction if a plaintiff establishes by a preponderance of the evidence that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and third parties if an injunction is granted; and (4) granting the injunction serves the public interest. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *Al Ghanim Combined Group v. United States,* 56 Fed.Cl. 502, 519–20 (2003); *Interstate Rock Products, Inc. v. United States,* 50 Fed.Cl. 349, 354 (2001). Having found that Plaintiff has achieved success on the merits, the Court addresses the three remaining factors.

### Irreparable Injury

■ Plaintiff contends that it will be irreparably harmed if the procurement is not

---

**25.** The scored cost for the Government Direct Loan was a function of the amount of the loan and the amount and timing of the payments of on

the loan, calculated according to procedures set out in Section 3.2.3 of the Solicitation. AR 16–18.

enjoined because it will lose the opportunity to compete on a level playing field due to the violations of the Solicitation. Such a loss of opportunity to compete has been found sufficient to constitute irreparable harm. *Gentex*, 58 Fed.Cl. at 654; *United Payors and United Providers Health Servs., Inc. v. United States*, 55 Fed.Cl. 323, 333 (2003); *see also Quality Trans. Servs., Inc. v. United States*, 12 Cl.Ct. 276, 282 (1987). Here, Hunt was unfairly denied an equal opportunity to compete "perhaps only because of the defendant's improper conduct." *SAI Industries Corp. v. United States*, 60 Fed.Cl. 731, 747 (May 26, 2004).

This transaction is a fifty-year project of enormous scope, which may include a follow-on sole-source procurement for the remaining privatization at Hickham, thus raising the stakes and the harm to an unsuccessful offeror whose proposal was not fairly considered in this first round.

### Balance of Hardships and Public Interest

The Court must balance the harm to the Air Force, the Intervenor and third parties, if a permanent injunction is granted against the harm to Plaintiff if injunctive relief is denied. *ES–KO, Inc. v. United States*, 44 Fed.Cl. 429, 435 (1999).

Defendant contends that further delay in closing this transaction will be more costly for the public if market interest rates continue to rise. However, in fashioning injunctive relief the rights of parties are not governed by potential pecuniary loss but by whether equitable relief is necessary to redress a wrong.

The Court recognizes that any delay in refurbishing or constructing military housing is a significant harm to third parties, which will necessarily occur if the Air Force must retrace some of its steps in this transaction. Similarly, Actus will be harmed by having to undergo a recompetition—but not as severely as Hunt would be, if the unfair selection were allowed to stand. Actus will still be able to compete, this time on equal footing with Hunt, whereas absent injunctive relief, Hunt

will have been unfairly denied a meaningful opportunity to compete. On balance, injunctive relief is warranted to remedy the unfair process here.

Generally, the public interest is served by ensuring that the Government procurement process is fair. *PGBA, LLC. v. United States*, 60 Fed.Cl. 196, 221 (2004), *reconsideration denied*, 60 Fed.Cl. 567 (2004); *Cincom Sys. Inc. v. United States*, 37 Fed.Cl. 266, 269 (1997) (citing *Magellan Corp. v. United States*, 27 Fed.Cl. 446, 448 (1993)). Plaintiff has shown that granting a permanent injunction will serve the public interest by ensuring that the selection process under this Solicitation is conducted fairly. Otherwise, the Air Force's violations would have the adverse effect of undermining the integrity of the competitive process for privatizing military housing. In granting injunctive relief, public confidence in that process will be preserved. *Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002); *Day & Zimmermann*, 38 Fed.Cl. 591, 610 (1997) (citing *PCI/RCI v. United States*, 36 Fed.Cl. 761, 776 (1996)).

The Court of Appeals for the Federal Circuit has cautioned that equitable powers "should be exercised in a way [that] best limits judicial interference in contract procurement." *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed.Cir.1994) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)). Heeding this caution, the Court does not direct the Air Force to go back to square one and issue a wholly new solicitation. Rather, the Court sets aside the selection of Actus and directs the Air Force to reassess its needs, amend the Solicitation accordingly (or not) and evaluate final proposal revisions consistent with that Solicitation.[26]

### Order

1. The Court **GRANTS** Plaintiff's request for a declaratory judgment and Motion for a Permanent Injunction as follows:

---

**26.** The Court is *not* directing the Air Force to amend its Solicitation in any particular way or at all, it is only directing the Air Force to disclose the terms of the Solicitation and the form legal documents equally to both offerors, so they may submit proposals based upon the same terms, and then evaluate those offers in accordance with the Solicitation.

a. The Court hereby declares that the Air Force's selection of Actus Lend Lease under Solicitation No. KNMD2002–00–01 is null and void, and the August 23, 2003, selection of Actus is hereby set aside;

b. The Air Force, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from proceeding to close the transaction under Solicitation No. KNMD2002–00–01 for the military housing privatization project at Hickham AFB, Hawaii, unless and until such time as the Air Force complies with said Solicitation as originally issued or as may be amended to reflect its actual needs, and fairly evaluates any and all offers received pursuant to said Solicitation;

c. Actus Lend Lease, its subsidiaries, agents and assigns be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from proceeding to close said transaction, and from executing, receiving, and performing on any contract or transaction under Solicitation No. KNMD2002–00–01, pending the Air Force's actions and reevaluation of offers described above;

d. The Air Force is hereby ordered to reinstate Hunt in the competitive range under Solicitation No. KNMD2002–00–01 and either confirm or amend subject Solicitation to clarify the terms of the form legal documents, and to have all offerors re-submit final revised proposals for re-evaluation consistent with said Solicitation as reissued or amended and this Court's findings herein;

e. The Air Force shall conduct a debriefing of Actus, equal to that conducted for Hunt, so Hunt does not enjoy an undue advantage in any recompetition.

2. Plaintiff's request for bid preparation and proposal costs is denied.

3. The parties shall file proposed redactions of this opinion by July 14, 2004.

4. The Clerk shall enter judgment accordingly.